CLAUDE E. VROOMAN, Appellant, v. CITY OF ST. LOUIS ET AL.—88 S. W. (2d) 189.

Court en Banc, November 2, 1935.

*Donnell & McDonald* for appellant.

938

*Charles M. Hay, E. H. Wayman* and *Benjamin H. Charles* for respondents.

COLLET, J.—Injunction to perpetually enjoin and restrain the city of St. Louis, Bernard F. Dickmann as mayor, Louis Nolte as comptroller and Henry C. Menne as treasurer, from engraving, signing, issuing, selling or delivering any bonds of an issue designated as Jefferson National-Expansion Memorial Bonds. The cause was filed by plaintiff taxpayer in the Circuit Court of the City of St. Louis. The circuit court sustained defendants' general demurrer to plaintiff's petition. Plaintiff refusing to plead further, judgment was entered dismissing the bill, from which judgment plaintiff appealed. The petition occupies eighty-eight pages of the printed abstract of the record. Only such parts thereof will be referred to as are necessary to a determination of the issues presented here.

It is alleged that on March 29, 1934, the Senate and House of Representatives of the United States passed a joint resolution creating the United States Territorial Expansion Memorial Commission (hereinafter designated the "United States Commission") for the purpose of considering and formulating plans for designing and constructing a permanent memorial on the Mississippi River at St. Louis; providing for the appointment of the membership of the commission; authorizing the commission to accept from any source, public or private, money or property to be used for the purpose of making surveys and investigations, formulating, preparing and considering plans and estimates for the improvement, construction, or other expenses incurred or to be incurred, and providing further that the United States should not be held liable for any obligation or indebtedness incurred by the United States Commission, the State of Missouri, the Jefferson National-Expansion Memorial Association, the city of St. Louis, Missouri, or any other agency or officer, employee or agent for any purpose. The President signed the resolution June

15, 1934. The commission was organized December 19, 1934. On May 1, 1935, a comprehensive report setting forth a detailed plan for the proposed improvement, submitted by the Jefferson National-Expansion Memorial Association, was adopted by the United States Commission. This report was submitted to the Federal Emergency Administration of Public Works through the chairman of the Applications Division of the Works Allotment Board May 2, 1935. It estimated that between five and six thousand men would be furnished employment in the clearance of the site for the memorial and other preparatory work during a period ending July 1, 1936. In due time the United States Commission was directed to make formal application to the Federal Emergency Administration of Public Works (known as the "Public Works Administration") for a grant to finance the project. This was subsequently done. The application fixes the total estimated cost at $28,515,000 including not less than $17,000,000 for buildings. Included in the application is a statement that the city of St. Louis proposes to contribute a sum representing approximately the estimated cost of the site (fixed at $7,216,750) and was taking the necessary steps for the issuance and sale of $7,-500,000 of its bonds for that purpose. A letter detailing the history and purposes of the project accompanied the application. It is alleged that the Federal Emergency Administration of Public Works was established by Title II of the National Industrial Recovery Act, empowered to perform such functions as might be authorized by the President, and continued in existence by the Emergency Relief Appropriation Act of 1935. By the Emergency Relief Appropriation Act of 1935 the President was authorized to prescribe such rules and regulations as might be necessary to carry out that act.

On April 10, 1935, the Governor of Missouri approved an act (hereinafter referred to as the "Enabling Act") unanimously passed by the Fifty-eighth General Assembly, with an emergency clause, authorizing any city now or hereafter having a population of 400,000 or more, to incur an indebtedness upon the approval of two-thirds of the voters of such city for the purpose of obtaining funds to contribute toward the acquisition and establishment of National Parks or Plazas within such sites. On May 24, 1935, petitions complying with the provisions of the Enabling Act, were filed with the Board of Aldermen of the city of St. Louis asking that an election be held to determine whether an indebtedness should be incurred for the purpose of contributing not to exceed $8,000,000 to the United States or its qualified authority for the purpose of assisting in the acquisition and establishment of a National Park or Plaza. Ordinance No. 40592 was thereafter passed by the board of aldermen and approved by the mayor on July 1, 1935, calling an election for September 10, 1935, to determine whether an indebtedness should be incurred for $7,500,000 for the purpose stated in the petitions and for $800,000

to construct approaches to a municipal bridge. The election was held September 10, 1935, resulting in a vote favorable to incurring the indebtedness. Ordinances were then passed declaring the results of the election and authorizing and directing the issuance and sale of bonds in the amount and as described in the ordinance. It is alleged that pursuant to the various proceedings of the board of aldermen the defendants are about to engrave, issue and sell the bonds. The petition proceeds with the assertion of many grounds upon which the bonds are charged to be invalid and concludes with a prayer for a perpetual restraining order. The foregoing will suffice to give a general outline of the proceedings involved. The many details of the petition which are material but which have been omitted will appear in connection with the determination of the points advanced by the parties in their briefs.

The validity of the Enabling Act is challenged on several grounds. Omitting the title, it is as follows:

"Section 1. Board of aldermen to call bond election for national park or plaza.—In the event that at any time the United States, or any qualified authority thereof, shall propose to establish and improve, within any city in this state now or hereafter having a population of 400,000 inhabitants or more, a National Park or Plaza, intended and designed to commemorate any great event or movement in our National history, to be accessible to the public under Federal regulation, and to cover an area within such city of not less than one million square feet, and 1000 or more taxpayers of such city shall petition the Board of Aldermen of such city, asking that an election be called and held to determine whether, in consideration of and in order to induce the location and establishment of such improved Park or Plaza in such city, the city shall incur an indebtedness and evidence the same by the issuance of bonds for the purpose of providing funds to make the payment by way of assistance hereinafter referred to, it shall be the duty of the Board of Aldermen as soon as conveniently may be. to call and hold such election either as a special election or at and as a part of any regular city or state election.

"Section 2. Question to be submitted—amount of bonds to be voted upon.—At such election, there shall be submitted to the qualified voters the question whether or not such city shall incur an indebtedness and evidence the same by the issuance of bonds for the purpose of providing funds to pay by way of assistance to the United States, or its qualified authority, in consideration of and in order to induce the location and establishment within such city of such Park or Plaza, the sum fixed by the ordinance providing for the holding of such election; which sum shall not exceed one-fourth ($\frac{1}{4}$) of the total amount to be expended by the United States, or its authority, for the acquisition and establishment of such

Park or Plaza (including site and improvements), and shall not exceed the sum of Eight Million ($8,000,000) Dollars; nor shall such sum, when added to the other indebtedness of the City, exceed its capacity to become indebted under the Constitution of this State.

"Section 3. Assent of two-thirds of voters required.—In the event that at such election two-thirds (⅔) or more of the voters of such City voting on such proposition, shall vote in favor thereof, then such City, shall issue and dispose of its bonds thus authorized, and pay to the United States or its qualified authority, out of the proceeds of such bonds, the amount of the payment and consideration so voted. All bonds issued under the provisions of this Act shall be subject to all limitations, terms and provisions of law now or hereafter applicable to the issuance and sale of general obligation bonds of such cities.

"Section 4. United States granted authority to establish parks in state.—The consent of the State of Missouri is hereby fully given to the acquisition by the United States, or any qualified authority thereof, by purchase, grant or condemnation, of any lands or improvements thereon, in any of the cities to which this Act is applicable, for the purpose of establishing, improving in any manner, and maintaining any National Park or Plaza of the character described.

"Section 5. Emergency.—Inasmuch as immediate action is necessary to obtain the establishment of any such Parks or Plazas by the action of the United States, and the prompt undertaking of such work would tend greatly to relieve the burden of unemployment relief to this State and its cities, and would furnish gainful employment to many of their distressed and idle workmen, an emergency is declared to exist within the meaning of the Constitution, and this Act shall take effect and go into force immediately from and after its passage. Approved April 10, 1935." [Laws 1935, p. 193.]

It is charged that this act is invalid because it provides for the levy and collection of taxes by a city for purposes not public or corporate in character in violation of Sections 1 and 3, Article X of the Missouri Constitution. Those constitutional provisions are:

"Section 1. Taxing power, how exercised.—The taxing power may be exercised by the General Assembly for State purposes, and by counties and other municipal corporations, under authority granted to them by the General Assembly for county and other corporate purposes."

"Section 3. Taxes for public purposes only—must be uniform. —Taxes may be levied and collected for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and all taxes shall be levied and collected by general laws."

A number of cases are cited from this and other jurisdictions asserting the general rule that taxes levied by a municipality must

944

be for both public and municipal purposes. The rule is clearly and concisely stated in 1 Cooley on Taxation (4 Ed.), section 178, pages. 388, 389, as follows:

"The 'public' that is concerned in a legal sense in any matter of government is the public the particular government has been provided for; and the 'public purpose' for which that government·may tax is one which concerns its own people, and not some other people· having a government of its own, for whose wants taxes are laid. . . . The purpose must in every instance pertain to the sovereign-ty with which the tax originates; . . . This is the general rule; some apparent exceptions there unquestionably are, where the nation and the state have common interests and a common duty, such as may require the action of both, and would justify the levy of a tax by either or both to accomplish the one object."

But the determination of the general rule does not settle the question before us. As.Judge RAGLAND said in Dysart v. City of St. Louis, 321 Mo. 514, l. c. 521, 11 S. W. (2d) 1045:

"But, though the principle that taxes may be levied for public purposes only is one of universal acceptance, its application is often difficult. What constitutes a public use is not easy to define."

Whether the contribution of the city's funds to the United' States or its legally constituted authority for the purpose of assisting in the acquisition and construction of a National Park or Plaza located within the city is a public and corporate one can only be determined by an analysis of the objects and result of the contribution. From the petition it is clear that the proposed park will be open to the use of the inhabitants of the city as fully and completely as are existing city parks. It is also evident that it is designed to be both educational and recreational and, no less important, will be conveniently accessible to those inhabitants of the city living in the densely populated sections. There can be no doubt that the levy of taxes for the acquisition and construction of a park for the use of the inhabitants of a city has long been held to be for both a public purpose and a proper corporate purpose. Of what moment is the fact that in this instance the major part of the funds for acquiring and constructing the improvement is to be furnished by the National Government which will, figuratively speaking, constitute the receptacle within which the public's title will rest? We think none. The proposed park is to be a public park available to the use of everyone. A contribution to its acquisition and establishment will be for a. public purpose. The fact that people residing beyond the corporate limits of the city may receive occasional benefit or enjoyment from the use of the park does not deprive that purpose of its corporate character.

It is ·argued that the benefits flowing from the ownership of the property. will inure to the "private" use of the United States and

that since Congress has the power of disposition of property owned by the United States it may acquire the title to this site by condemnation and then transfer the title or the right of enjoyment thereof to private interests for private purposes. We are not familiar with any kind of use to which a park might be put which would answer the description of a "private" use of the United States. Learned counsel for appellant point to none. Neither is the argument that the United States may take the property for a public use and devote it (including respondent's interest therein) to the use of private interests persuasive. It is true that Congress has the power of control and disposition, in a general sense, of property belonging to the United States, but the Federal Government has no authority to acquire private property for the use of private interests. [12 C. J., sec. 1042, p. 1252, and cases there cited.] We will not assume that the Federal Government will do that which under the Federal Constitution it is not permitted to do.

Appellant contends that because of the fact a Constitutional Amendment (Sec. 12, Art. X) was considered necessary and adopted as a prerequisite to the payment of funds of the city of St. Louis to a corporation organized for the celebration of the Louisiana Purchase Centennial to be used by that corporation for that celebration, a precedent was established for the necessity of a constitutional amendment in this case. The distinction lies in the fact that the contribution for the Louisiana Purchase Centennial was made to a private corporation to be administered by that private corporation without the trust attached to the donation requiring its use for strictly public and corporate purposes.

But appellant says in effect that if the distinction be conceded the Enabling Act is invalid because it authorizes the making of gifts to, or the loaning of the credit of a municipality to the United States— a corporation in violation of Sections 46 and 47 of Article IV and Section 6 of Article IX of the Missouri Constitution.

We do not agree to the premise that the United States is a corporation in the sense that term is used in the constitutional provisions referred to. The cases cited by appellant on the proposition that the United States is a corporation are not decisive of that question. To illustrate: The case of Respublica v. Sweers (Pa.), 1 Dallas, 45, was a prosecution for forgery. The indictment alleged the United States had been defrauded. The form of the indictment was challenged on the ground that "the United States were not a body corporate known in law." The court held: "From the moment of their association, the United States necessarily became a body corporate; for, there was no superior from whom that character could otherwise be derived." [l. c. 48.] The case of United States v. Perkins, 163 U. S. 625, also cited by appellant involved the question of whether the United States was such a corporation as was

exempt from taxation under a New York statute exempting corporations. The court held the statute applied only to corporations created under the laws of New York and subservient thereto.

The authorities cited by appellant and others which we have examined indicate that the underlying reason for the infrequent characterization of the United States as a corporation resulted from an effort to demonstrate its power to discharge the functions of a sovereignty. The United States has been referred to as a corporation only in instances where the exercise of the sovereign power involved functions peculiar to corporations, as that term is used in its ordinary sense. [United States v. Tingey, 5 Peters, 66; In re Merriam's Estate (N. Y.), 36 N. E. 505; Dixon v. United States, 1 Brock, 177; Abelman v. Booth, 62 U. S. 506; United States v. Fox, 94 U. S. 315; United States v. Maurice (No. 15747), 26 Fed. Cas. 1216; Deady v. Village of Lyons, 57 N. Y. Supp. 448.] In the Tingey case, supra, appears this language:

"It is competent to (for) the government of the United States to become a party to a voluntary bond executed by one of its officers, without any authority given by a legislative act. It is essentially incident to sovereignty, without any express grant, that such a power shall exist. According to the cases which have been referred to, such a power belongs to a corporation; to a subordinate agent of the government; and a fortiori, it belongs to the government itself." [5 Peters, 115, l. c. 122.]

And in United States v. Fox, supra.

"The term 'person' as here used applies to natural persons, and also to artificial persons,—bodies politic, deriving their existence and powers from legislation,—but cannot be so extended as to include within its meaning the Federal government. It would require an express definition to that effect to give it a sense thus extended." [94 U. S. 315, l. c. 321.]

If the United States is not a corporation in the sense that term is used in Sections 46 and 47 of Article IV and Section 6, Article IX, where is the constitutional inhibition which makes the Enabling Act invalid? Certainly the United States does not answer the description of an "individual," an "association" or an "association of individuals." The question therefore resolves itself into this,— the power exercised by the Legislature in enacting the Enabling Act was concededly not delegated to the United States by the Federal Constitution. Hence that power was by Amendment Ten to the Federal Constitution "reserved to the States respectively or to the people." The State Constitution neither forbidding nor expressly granting the authority to the Legislature, is the act of that body valid? It has long been held that our State Constitution is not a grant of, but a limitation on, legislative powers. In Ex parte Roberts, 166 Mo. 207, l. c. 212, 213, Judge SHERWOOD quotes the rule as stated in Cooley on Constitutional Limitations as follows:

" 'The legislative department (of a State) is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion.' " [Cooley, Const. Lim. (6 Ed.), p. 104.]

" 'The rule of law upon this subject appears to be, that except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being prima facie valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the Constitution, and the case shown to come within them. [Ib., pp. 200, 201.]' "

Many other cases are of similar import. [State ex rel. McDonald v. Lollis, 326 Mo. 644, 33 S. W. (2d) 98; McGrew v. Missouri Pacific Ry. Co., 230 Mo. 496, 132 S. W. 1076; Harris v. William R. Compton Bond & Mortgage Co., 244 Mo. 664, 149 S. W. 603; State v. St. Louis, I. M. & S. Ry. Co., 253 Mo. 642, 162 S. W. 144; State ex rel. Moberly Special Road District v. Burton, 266 Mo. 711, 182 S. W. 746; State ex rel. Columbia Special Road District v. Johnson (Mo.), 182 S. W. 750; Williams v. United States Express Company (Mo.), 184 S. W. 1146; State ex rel. Rhodes v. Public Service Commission of Missouri, 270 Mo. 547, 194 S. W. 287; Ludlow-Saylor Wire Co. v. Wollbrinck, 275 Mo. 339, 205 S. W. 196.] It follows that the Constitution not prohibiting, the Legislature had the authority to enact this statute.

It is contended that the Enabling Act is void for unreasonableness because: (1) It does not require that the United States shall expend the money received from the city within any specified time; (2) no control is reserved to the city over the expenditure of the funds and objectionable uses, if created, will be remediless by the city; (3) it applies only to cities now or hereafter having 400,000 or more inhabitants which is an arbitrary provision having no reasonable relation to the object to be accomplished; (4) the amount of the authorized contribution being a possible maximum of $20 per capita, is excessive; (5) it makes the bonds subject to the terms

and provisions of law "hereafter" applicable to issuance and sale of general obligation bonds, thus rendering the bonds indeterminate and uncertain, injuriously affecting their disposal price.

The first and second propositions are closely related to other points to be dealt with hereafter and will be determined at that time.

The third proposition is determined adversely to appellant's contention by the case he cites (State ex inf. Attorney General v. Armstrong, 315 Mo. 298, l. c. 312, 286 S. W. 705. [Also, see, State ex rel. Webster Groves Sanitary Sewer District v. Smith, 337 Mo. 855, 87 S. W. (2d) 147.]

■ Appellant cites no authority in support of the fourth. We know of no authority which holds that the amount of a bond issue of this kind shall be determined solely by the possible amount of tax which might be paid *per capita*.

The fifth is answered by Section 7220, Revised Statutes 1929, which provides that municipal bonds may not be sold for less than par. That section is applicable to the city of St. Louis. [Halbruegger v. St. Louis, 302 Mo. 573, l. c. 591, 262 S. W. 379.]

■ It is insisted that the Enabling Act is invalid because it delegates nondelegable powers of the General Assembly and the city in violation of Section I of Article IV and Article X of the Constitution.

By the Enabling Act the Legislature authorized cities which now or hereafter might have 400,000 or more inhabitants to make contribution to the United States or its constituted authority "in consideration of and in order to induce the location and establishment of such improved Park or Plaza in such city" by the United States. The act fixed the conditions which should be complied with in order to validate a contribution made under the act. This was not an improper delegation of legislative authority. One of the earliest decisions of this court on the subject was in the case of City of St. Louis v. Alexander, 23 Mo. 483, where the validity of an act of the Legislature authorizing the city of St. Louis to subscribe to the stock of a railroad (before such subscriptions were prohibited by constitutional amendment) was under consideration. In its *Per Curiam* opinion the court said:

"The act . . . must be observed and obeyed in order to give vitality and legal effect to the act to be afterwards performed. It is not a delegation of legislative power to the city authorities to do certain things before the act is to be a law, and, if not done, no law. The act is a complete expression of legislative will. It is a law in itself, and is as much a law, notwithstanding the mayor and city council should refuse to do any act under it, as if they were to comply fully with its mandates. No act on the part of the city is required to make it a law. The Legislature must exercise the power to make laws. The power remains with that body alone. It cannot be dele-

gated; yet no one will deny to the Legislature the power to pass laws with conditions on many subjects."

In the case of State ex rel. North Missouri Central Railroad Co. v. Linn County Court, 44 Mo. l. c. 511, we find a later expression of this court in the following language:

"The law is now well settled in the United States that the Legislature, having control of the subordinate municipal organizations, and the power to enlarge or abridge their powers at pleasure, may make them the instruments in carrying out works of public improvement, and may authorize them to make the subscription and to levy taxes and issue the bonds to meet the assessments thereon. Such is now the universal current of decisions, and the question has not been opened to dispute in this State since the case of the City and County of St. Louis v. Alexander, 23 Mo. 483."

Will there be an improper delegation of the authority rightfully conferred upon the city by the city's act of delivering the proceeds from the sale of its bonds to the United States without retaining the superintending control over the actual expenditure of the funds? Again, we think not. The Legislature by the Enabling Act authorizes a city to contribute its funds to the United States under certain conditions and circumstances. It does not require that the city assume the responsibility for the acquisition or construction of the object of the contribution. Therein lies the distinction between this case and the cases cited by appellant. The cases cited involved situations where the city had been given authority by statute to make certain improvements and had delegated that responsibility to others. If in this case the city was proposing to leave to others the responsibility of delivering the funds to the United States or of determining whether the proposal involved the purpose and object required by the statute, those cases would apply, since the Legislature has placed that responsibility on the city and there it must stay.

Appellant insists that even if the Enabling Act is valid the emergency clause was not and consequently all proceedings prior to August 27, 1935 (the date the Enabling Act would be effective without a valid emergency clause) were invalid. We do not think it necessary to determine the validity of the emergency clause. The bond election was not held until September 10, 1935, after the Enabling Act was effective without any emergency clause. Therefore, no substantive right of anyone was invaded by the performance of the pre-election preliminaries prior to August 27.

The appellant contends that the requirements of the Enabling Act were not met because, first—Section 1 of the Enabling Act requires, as a prerequisite to the calling of an election, that "the United States, or any qualified authority thereof, shall propose to establish and improve . . . a National Park or Plaza, intended and designed to commemorate any great event or movement in our

National History, to be accessible to the public under Federal regulation, and to cover an area within such City of not less than One Million square feet," and that no such proposal had been made to the city of St. Louis prior to the enactment of the city ordinance (No. 40592) calling the election. The petition alleges and the demurrer admits that on June 15, 1934, the President signed a Joint Resolution previously passed by the Senate and House of Representatives authorizing the creation of a Federal Memorial Commission to be known as the "United States Territorial Expansion Memorial Commission" (designated the "National Commission") to consider and formulate plans for the construction of a permanent memorial to the men who made possible the territorial expansion of the United States, particularly President Thomas Jefferson and his aids Livingston and Monroe and the explorers Lewis and Clark. Said memorial to be located "on the Western bank of the Mississippi River at or near the site of old St. Louis." The resolution provided the method of appointment of the members of the commission. The members were appointed and met December 19, 1934, at St. Louis, selected a chairman, vice chairman and executive committee, "received the presentation of various facts before it," empowered the executive committee to act for the commission at interim meetings, and met again at Washington February 1, 1935. The executive committee met April 13, 1935, and received, examined and approved a report made by the Jefferson National-Expansion Memorial Association covering the following subjects: The Joint Resolution of Congress; historical importance of the project; the plan and scope of project; the man hours involved; the time schedule; a plan for national architectural competition; a statistical zoning survey; a portfolio of maps showing buildings in the area of the contemplated memorial; parking and parking problems and municipal and State co-operation. This report was distributed to members of the United States Commission which met May 1, 1935, adopted and approved the report, forwarded it to the Public Works Administration with a request that condemnation proceedings be instituted to obtain title to the site. On June 15, 1935, the commission filed with the Public Works Administration an application addressed to the United States of America for a grant of funds to aid in financing the construction of a National Park or Plaza in the city of St. Louis, consisting, among other things, of a park, recreational facilities, museums, lecture halls and other educational features, a harbor for pleasure craft and parking facilities for automobiles. In this application it was stated that "The City of St. Louis proposes to contribute a sum representing approximately the estimated cost of the site. The city is now taking the necessary steps for the authorization, issuance and sale of $7,-500,000 of its bonds to furnish these funds."

From the foregoing it sufficiently appears that the United States

Territorial Expansion Memorial Commission is a duly qualified authority of the United States and that the United States through that commission has made a "proposal" such as is required by the Enabling Act.

The petition further alleges that the Enabling Act was not complied with because Section 2 of that act provides that the amount of the proposed contribution shall be fixed by the ordinance providing for the holding of the election ". . . which sum shall not exceed one-fourth of the total amount to be expended by the United States, or its authority for the acquisition and establishment of such Park or Plaza (including site and improvements) and shall not exceed the sum of eight million dollars, . . ." and that no definite allotment of funds having been made to this project by the United States, it was impossible to fix a sum in the ordinance which would not exceed one-fourth of the amount to be expended. The ordinance, which is set out in full in the petition, fixes the total cost of the improvement at "approximately $30,000,000." The use of the word "approximately" indicates that the figure of $30,000,000 is what of necessity it must have been,—an estimate. The petition does not allege that the estimate was an inaccurate or improper one. The situation presented therefore is: The qualified authority of the United States has made the proposal required by the Enabling Act, the petition of the taxpayers, necessary to an election has been filed, and the board of aldermen, confronted with the duty of determining what sum will not exceed one-fourth of the total amount to be expended has made an honest and accurate estimate and used the amount of that estimate in determining the amount of the proposed indebtedness to be submitted. Since it would be impossible to determine the cost of the project prior to its completion in any way other than by an estimate, certainly the Legislature intended that such a course should be followed. If it was necessary that the actual cost of all public improvements should be determined and fixed in advance of construction or a contract therefor, instead of the limit of the cost, no public improvements would be made.

The petition alleges that there is no agency of the United States which has authority to authorize the expenditure of any funds of the United States for the acquisition, establishment and improvement of the contemplated Park or Plaza. It is argued that such being the case the board of aldermen could not have found that any amount was to be expended and hence could not have found that a total of $30,000,000 was to be expended.

The United States Commission has made application to the Federal Emergency Administration of Public Works (called the Public Works Administration) for a grant to assist in building the Memorial Park. It appears that it is from that source that the Federal funds are expected to come. Does the Public Works Administration have au-

thority to make the grant? It was created in 1933 by the National Industrial Recovery Act (40 U. S. C. A., secs. 401-414), the material parts of which are as follows:

Section 401. ''(a) To effectuate the purposes of this chapter, the President is hereby authorized to create a Federal Emergency Administration of Public Works, all the powers of which shall be exercised by a Federal Emergency Administrator of Public Works (hereafter referred to as the 'Administrator'), and to establish such agencies . . . as he may find necessary. . . .''

Section 402. ''The Administrator, under the direction of the President, shall prepare a comprehensive program of public works, which shall include among other things the following: (a) Construction, repair, and improvement of public highways and park ways, public buildings, and any publicly owned instrumentalities and facilities; . . . (c) any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public. . . .''

Section 403. ''With a view to increasing employment quickly (while reasonably securing any loans made by the United States) the President is authorized and empowered, through the Administrator or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 402. . . .

''(c) In the acquisition of any land or site for the purposes of Federal public buildings and in the construction of such buildings provided for in this chapter, the provisions contained in sections 305 and 306 of the Emergency Relief and Construction Act of 1932, as amended, shall apply.''

Section 409. ''The President is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this chapter, and any violation of any such rule, or regulation shall be punishable by fine of not to exceed $500 or imprisonment not to exceed six months, or both.''

By the terms of the National Industrial Recovery Act the agencies created thereunder ceased to exist two years after June 16, 1933 (Par. d, Sec. 401) but by Section 12 of the Federal Emergency Relief Appropriation Act of 1935 (15 U. S. C. A., sec. 728, August, 1935, Cumulative pamphlet, page 230) the former act was continued in effect until June 30, 1937, and all sums appropriated to carry out the purposes of the Act of 1933 were made available until June 30, 1937. The pertinent provisions of the Federal Emergency Relief Appropriations Act of 1935 follow:

''That in order to provide relief, work relief and to increase employment by providing for useful projects, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated,

to be used in the discretion and under the direction of the President, to be immediately available and to remain available until June 30, 1937, the sum of $4,000,000,000, . . . available for the following classes of projects, . . . namely; . . . loans or grants, or both, for projects of States, Territories, Possessions, including subdivisions and agencies thereof, municipalities, . . . where, in the determination of the President, not less than twenty-five per centum of the loan or the grant, or the aggregate thereof, is to be expended for work under each particular project, $900,-000,000; (h) . . . and miscellaneous projects $350,000,000. . . . Provided further, That . . . public buildings projects undertaken pursuant to the provisions of this joint resolution shall be carried out under the direction of the respective permanent Government departments or agencies now having jurisdiction of similar projects. . . ."

"Sec. 6.—The President is authorized to prescribe such rules and regulations as may be necessary to carry out this joint resolution, and any willful violation of any such rule or regulation shall be punishable by fine of not to exceed $1000."

The above-quoted Acts of Congress provide the funds and authorize a grant of those funds for the purpose involved herein.

The question is raised as to when and under what conditions can the bonds be sold and the proceeds delivered to the United State authorities. The appellant, adhering to the position he took with reference to the validity of the ordinance calling the election, insists that the entire proceedings of the board of aldermen are void for lack of a previous definite allotment by the Federal authorities. The board of estimate and apportionment of the respondent city, although approving the ordinance directing the issuance and sale of the bonds, attached a memoranda to their formal approval in the nature of a warning to the board of aldermen indicating that, in their opinion, under the terms of the Enabling Act and the ordinance calling the election all of the bonds could not be sold until an allotment had been made for three-fourths of the total estimated cost of $30,000,000. The respondent asserts it now has the right to issue the bonds but should not yield possession of the proceeds of the sale thereof until there has been a commitment by the Federal Government to expend three times the amount delivered to it by the city. The Legislature determined the answer to that question by the terms of the Enabling Act, whether wisely or unwisely is not for us to say. [Ex parte Roberts, ante.] Stripped of everything not directly relating to this question, Section 2 of that act reads:

"There shall be submitted . . . the question whether or not such city shall . . . pay . . . to the United States . . . in consideration of and in order to induce the location and establishment within such city of such Park or Plaza, the sum fixed by

the ordinance; . . . which sum shall not exceed one-fourth of the total amount to be expended by the United States. . . ."

The parties evidently assume that the words "which sum" refer to the amount to be paid. We think they refer to the amount fixed by the ordinance. When the words which fix the contingencies upon which the payment shall be made are eliminated, Section 2 is "boiled down" to this:

"There shall be submitted . . . the question whether or not such city shall . . . pay . . . to the United States . . . the sum fixed by the ordinance; . . . *which sum* shall not exceed one-fourth of the amount to be expended. . . ."

The only sum which has been mentioned in the act prior to the use of the reference word "which," is the sum to be fixed in the ordinance, hence the reference word can refer to no other. Having heretofore ascertained that the sum fixed in the ordinance was properly determined we have only to decide when that sum shall be paid. It is evident from the language of the statute that the sum to be paid is in the nature of a consideration for the purpose of inducing the accomplishment of a definite object. Unless a contrary intention is apparent a consideration is ordinarily to be paid upon the accomplishment of the purpose or object for which the consideration moves. There is nothing in this statute to indicate that the Legislature had a contrary intention. The purpose is plainly stated by the statute as being "to induce the location and establishment within such city of such Park or Plaza." The word "establishment," as used here, has the same meaning as "location." Its use merely adds a sense of definiteness or permanency. It follows that when the "Park" or "Plaza" is definitely located within the city of St. Louis by the United States Territorial Expansion Memorial Commission and the general plans for its construction are approved by the executive order of the President of the United States as a basis for the allotment of the funds necessary for its construction, substantially in accord with the proposal of the United States Commission, the bonds may all be sold and the proceeds derived from such sale delivered to the agency of the United States Government which is now or may be hereafter directed and empowered to acquire and construct the "Park" or "Plaza" so located and approved.

It has been suggested that the city has the power under its charter, irrespective of the Enabling Act to vote the bonds and make this contribution. There is no necessity to determine that question since in our judgment the entire proceedings, which were set out in the petition, clearly show they were based upon the Enabling Act.

Several technical questions relating to the regularity of the proceedings of the board of aldermen were raised by appellant. These we have examined carefully and find to be without merit. The judgment of the circuit court should be affirmed. It is so ordered. All concur.