## No. 14,229.

McNichols, Auditor of the City and County of Denver
*v.* City and County of Denver et al.
(74 P. [2d] 99)

Decided October 25, 1937.

Mr. WALTER M. SIMON, Mr. JOHN Q. DIER, for plaintiff in error.

Mr. MALCOLM LINDSEY, Messrs. HUGHES & DORSEY, Mr. GLENN G. SAUNDERS, for defendants in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. J. GLENN DONALDSON, Assistant, appearing under authority of C. S. A. '35, c. 93, §88.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

ON April 9, 1935, the city council of the City and County of Denver adopted an ordinance which provided for submitting to the taxpayers of Denver the question of incurring a bonded indebtedness of $750,000 to buy land for donation to the United States to be used by the federal government as a site for an air corps technical school and bombing field, to be located in or near the City and County of Denver, the ultimate issuance of the bonds being conditioned upon the investment by the federal government of the funds necessary in establishing and maintaining such training school and bombing field.

At an election held on May 21, 1935, the taxpayers of Denver by a vote of 39,395 for the bonds to 15,083 against the bonds, approved their issuance. After extended efforts and with the delays incidental to such matters, the project, with some modifications, was authorized by an Act of the Congress appropriating the sum of $2,275,000 therefor, which Act was approved by the President of the United States on August 26, 1937. By the Act the Secretary of War was authorized to accept, on behalf of the United States, as a site for a "branch of the Air Corps Technical School at Chanute Field, Illinois," title to 960 acres of land within and without the city limits of the city of Denver, and also an additional tract of land within the state of Colorado, "suitable for use as an aerial gunnery and bombing range by the Army Air Corps," being the tracts to be donated by Denver.

Shortly thereafter the Denver city council, in pursuance of the authority given by the taxpayers at the election mentioned, adopted ordinance No. 58 of the series of 1937, which provided for the issuance and sale of all or a portion of the bonds as might be necessary in carrying out the purpose so authorized. Thereupon the plaintiff in error, as auditor of the City and County of Denver, an elected official charged by law with the duty of protecting all funds of the city and given general auditing powers over all of its finances, commenced this action in the district court of the City and County of Denver under the

provisions of the Uniform Declaratory Judgments Act, chapter 93, sections 78 to 92, inclusive, '35, C. S. A. Plaintiff asked the court to declare, in substance, that neither the city nor any of its officers had power to issue any of said bonds or to levy taxes for the payment of the principal and interest thereon; and with reference to the plaintiff in error in his official capacity, to determine that he was under no duty to countersign or register the bonds or recognize them in any way whatsoever. Issue was joined by the defendants in error who requested that the court enter a judgment determining and declaring that the proper officers of the City and County of Denver have the power to issue the bonds in question and that the levying of direct ad valorem taxes on the property in the City and County of Denver to produce sufficient revenue to pay installments of principal and interest on the bonds as the same fall due, was lawful. The judgment of the trial court upheld the validity of the bonds, granted the relief sought by the defendants in error, and this proceeding in error is prosecuted to review the judgment of the district court.

The evident and admitted purpose of the action is to secure an advance judicial declaration as to the legality of these bonds and the right to levy taxes for their payment, in order that the officials of the City and County of Denver, and those who invest in such bonds, shall be fully advised in these particulars before the issuance and sale of the securities. One of the essential purposes of our Uniform Declaratory Judgments Act, supra, is to enable proper parties, in a proper case, to obtain such a determination of rights and duties in advance of the time when litigation might possibly arise with respect to a specific transaction. Section 78 of the Act reads in part: "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. * * *." And section 79 provides: "Any person * * * whose rights, status or other legal relations are

affected by a * * * municipal ordinance * * * may have determined any question of construction or validity arising under the * * * ordinance * * * and obtain a declaration of rights, status or other legal relations thereunder.''

The plaintiff in error, as auditor of the City and County of Denver, being a person whose rights and legal relations are affected by the ordinance which authorizes the issuance of these bonds, properly instituted these proceedings. By the complaint and the assignment of errors here he seemingly has raised every question which possibly could be conceived with respect to the transaction, all of which have been fully argued orally, and in extensive briefs, by especially able and painstaking counsel.

Some question developed under the briefs and in the oral argument—although not directly involved under the assignment of errors—with reference to the binding force and effect of a judgment in a suit of this character, particularly as against taxpayers not joined in the proceeding. We are definitely of the opinion that where such a suit, designed to test the validity of a bond issue, is brought by a public official charged with ministerial and executive duties in connection therewith, in which proceedings the political subdivision proposing the issuance of the bonds as a body politic and corporate and its elected and appointed officials who have duties to perform in connection with the issuance of such bonds, are joined as here, that a judgment rendered therein is res judicata as to the validity of the bonds against all persons, including taxpayers, even though they are not parties to the suit. To hold otherwise would, to a great extent, render nugatory to all intents and purposes the Declaratory Judgments Act. The reason for such a rule is well stated in 1 Freeman on Judgments (5th ed.), page 1090, where it is said: ''The position of such a governmental body towards its citizens and taxpayers is, upon principle, analogous to that of a trustee towards his cestui que trust, when they are numerous and the management and control

of their interests are by the terms of the trust committed to his care. A judgment against it or its legal representatives in a matter of general interest to all its citizens is binding upon the latter, though they are not parties to the suit.''

Van Fleet in his work on Former Adjudication, volume 2, page 1153, says: ''A judgment against municipal officers compelling them to levy or to collect a tax, binds all the taxpayers.'' There also is an adherence to this theory in the case of *Stockman v. Leddy*, 55 Colo. 24, 129 Pac. 220.

 The most important question presented relates to whether the expenditure here contemplated by the city of Denver is for a local and municipal purpose of the municipal corporation. If the proposed donation by the city to the United States of sites for the federal air corps technical school and bombing field in or near Denver is not a local or municipal matter, it is conceded by both parties that Denver is not authorized to exercise its borrowing power for the intended purpose. It also is conceded that Denver, by direct grant of the people by Article XX of the Colorado Constitution, has plenary power in local and municipal matters. See *Denver v. Henry*, 95 Colo. 582, 38 P. (2d) 895; *People ex rel. v. Pickens*, 91 Colo. 109, 12 P. (2d) 349; *Denver v. Mt. States Tel. & Tel. Co.*, 67 Colo. 225, 184 Pac. 604.

In the case at bar it is pointed out by defendants in error that the determination of the local and municipal character of the proposed outlay was made both by the ordinance enacted by the city council and by the vote of the taxpaying electors in favor of the issuance of the bonds, and they assert that a determination by the legislative authorities of the municipality is ordinarily conclusive thereof, and, except in the most extreme cases, will not be interfered with by the courts. On this subject it is sufficient to say that so much of these proceedings as can properly be considered legislative come within the general rule that where the constitutionality of legislative acts is questioned all presumptions are indulged in their

favor, and their invalidity must be established beyond a reasonable doubt. The question of what is or is not a local or municipal purpose is one which has frequently been before courts of all jurisdictions with results by no means harmonious. This condition of the authorities likely can be explained by the increasing needs of a more complex social order and the normal progressing development of the American people. As is said in Jones, Bonds and Bond Securities (4th ed.), section 147: "* * * The difficulty exists because of the necessary flexibility of the term itself, and because of ever-changing ideas of the populace and constantly varying conditions of social as well as governmental life, it being abundantly demonstrated that things are today looked upon as public or municipal projects which but a short time ago were not so regarded."

This court in the case of *Denver v. Hallett,* 34 Colo. 393, 83 Pac. 1066, in speaking of a similar legislative determination upholding the local and municipal character of Denver's city auditorium, at page 400 said: "The test is whether the power, if exercised, will promote the general objects and purposes of the municipality, and of this the legislature is the judge in the first instance; and unless it clearly appears that some constitutional provision has been infringed, the law must be upheld." And, at page 404, adopting a quotation from 19 Wisconsin 686, remarked: "To justify the court in arresting the proceedings and declaring the tax void the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at first blush."

An examination of the authorities on this perplexing question, from the earliest to the latest, discloses a chronologically uniform tendency on the part of courts to extend the permissible range of municipal and local projects, and not to unduly restrict municipalities in the exercise of their undertakings to promote the public welfare of their inhabitants. The decisions of the Supreme

Court of the United States with reference to the general welfare clause of the federal Constitution have exhibited the same trend, as appears from the words of Mr. Justice Cardozo in the recent case of *Helvering v. Davis* (decided May 24, 1937), 57 Sup. Ct. Rep. 904, sustaining the validity of the provisions of the Social Security Act relating to old age pensions, where he said: ''Congress may spend money in aid of the 'general welfare.' Constitution, Art. 1, §8; United States v. Butler, 297 U. S. 1, 65, 56 S. Ct. 312, 319, 80 L. Ed. 477, 102 A. L. R. 914. * * * Yet difficulties are left when the power is conceded. The line must still be drawn between one welfare and another, between particular and general. Where this shall be placed cannot be known through a formula in advance of the event. There is a middle ground or certainly a penumbra in which discretion is at large. The discretion, however, is not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment. This is now familiar law. 'When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress.' United States v. Butler supra, 297 U. S. 1, at page 67, 56 S. Ct. 312, 320, 80 L. Ed. 477, 102 A. L. R. 914.'' Viewed in the light of the principles just announced, it seems that the proposed bond issue must be sanctioned as being for a local and municipal purpose of the City and County of Denver.

In so far as local matters are involved, the City and County of Denver unquestionably has the powers, functions, duties and obligations pertaining to both a city and county. The support and relief of indigent persons, who, by reason of circumstances beyond their control, are unable to provide a livelihood for themselves is unquestionably a county function and obligation. '35 C. S. A., c. 124, §3. It is admitted by the pleadings, and is a matter of common knowledge, that for a number of years economic distress and unemployment to an abnor-

mal extent have existed in the United States and in the state of Colorado, which unemployment situation is particularly critical in the City and County of Denver, as in most urban centers. The federal and state governments, and the City and County of Denver, during this period, have expended large sums of money for direct relief and for the employment of the destitute on a public works program. One of the immediate motivating factors involved in the creation of the air corps technical school and bombing field and procuring their location in or near Denver is the providing of employment for those who are unable to find gainful occupation in private industry and who otherwise would of necessity have to be supported and maintained through the medium of doles or direct relief. It is asserted that when the lands contemplated for use in these projects are transferred to the federal government, immediate construction of the physical improvements on the sites will proceed and there will be employed from the unemployed residents of Denver a thousand persons during the next nine months who will receive as compensation for their work from funds to be provided by the United States approximately $968,000, which sum is in excess of the total purchase price of the land proposed to be donated by the city to the federal government. It thus is evident that the ultimate direct beneficial effect in relieving the unemployment situation in Denver, and the city's obligation to provide from its funds for the support of those otherwise unemployed, measured in dollars and cents, will exceed the amount of the outlay of the city in connection with the project.

On this point the plaintiff in error argues that no different situation is presented than would be the case if the city proposed donating a site for the plant of some large privately-owned industrial corporation and for an admittedly nonmunicipal purpose. Counsel say that such an enterprise would increase employment to the extent of the company's payroll and, so far as relieving unemployment, accomplish the same result as the expenditure

of a like amount of money by the federal government on the air corps technical school project. This assertion unquestionably is mathematically correct, but as an argument to be considered in connection with determining the local and municipal character of the donation here involved, seems largely fallacious. It cannot be denied that the proposed school, with its attendant functions, even though conducted and operated exclusively by the federal government, is a public project. Upon this basis alone it is evident that a different situation is presented than would be the case if a private concern were contemplating securing a gift of land from the city for its private enterprise. The mere fact that the control and management of the air school will be retained by the federal government through the war department obviously does not create an exclusive federal purpose so as to debar the proposed participation by the city as not being a proper local and municipal purpose.

Further, in the exercise of the proper local function of providing work for the relief of the unemployed, it is not material whether such employment is secured by laying out municipal funds directly in wages or in making such provision indirectly by purchasing land to make possible a federal project the completion of which, as a necessary incident, entails the expenditure of an equal or greater amount of federal funds for wages to those in need of employment relief. Under no reasonable theory could it be held to be beyond the power of the municipality, in carrying out an employment relief project, to purchase the tools required for workmen engaging in the work or to use a portion of its funds in purchasing materials to be used in connection therewith. If a part of such funds might be so used, and the project still be within the proper scope of municipal action, it would seem reasonable that all of the funds might be expended in providing the means of employment, if by reason of such expenditure an equal or greater amount would thereby be made available for employment relief, even though the actual carrying out of

the previously authorized project rested in another branch of the government. If the purpose to be carried out is municipal, the means by which it is to be made effective is a proper subject to be left to the municipality in the exercise of its discretion as to what is a wise public policy.

The undoubted weight of authority is to the effect that the donation of lands by municipalities as the site for college or school buildings to be constructed by the state in which the municipality is located, to be used in connection with the university or college supported and maintained by the state for public education, is for a proper municipal purpose. *Marks v. Purdue University,* 37 Ind. 155; *Burr v. City of Carbondale,* 76 Ill. 455; *Sinclair v. Lincoln,* 101 Neb. 163, 162 N. W. 488.

It is true that the science of aeronautics is in the inceptive stage of development and that schools of the character of the one here proposed are not numerous. It also is true that the primary purpose of the school is the training of the aviation personnel of the United States army in aerial gunnery and bombing, but, of necessity, it also must be conceded that the essentials of ordinary aero technique and mechanics will be included in the training, and by the establishing of the school in or near the city of Denver a special opportunity will be afforded its residents to secure an education on these subjects which, in the continuing development of our country, likely will prove as essential as some of the recognized existing courses embraced in our college curriculums of today.

In addition to what we have mentioned as being direct advantages accruing to the inhabitants of the City and County of Denver from the proposed outlay, the defendants in error enumerate a number of other advantages which we deem incidental, some of these being: Stimulation of air transportation service to Denver; beautification of the suburbs of the city; increase in the population brought about by the advent of the faculty and students of the school to the community; protection

of the city against possible future air raids; and the general promotion of trade and industry. It might be mentioned that this latter ground was considered as a primary benefit in *Denver v. Hallett, supra.* A number of courts, in sustaining the power of municipalities to make a particular donation, point out in the course of their opinions the various incidental advantages which would accrue to the municipality by reason of the establishment of an enterprise within its boundaries, and seem to hold that these factors alone could create a municipal purpose. It would seem under the authorities that such incidental benefits cannot in themselves create a municipal purpose and it has even been held, as in *Loan Association v. Topeka,* 20 Wall. 655, 22 L. Ed. 455, that a tax imposed by a city to make contributions which could be expected to produce only these incidental benefits is an unconstitutional deprivation of property, contrary to the Fourteenth Amendment to the federal Constitution. However, where a direct primary benefit accrues to the city and its inhabitants, these incidental matters have only a secondary bearing upon the question and we have so considered them. As indicated, it is our conclusion that the designated primary factors and direct advantages, as distinguished from incidental benefits, sufficiently import to the proposition under consideration the necessary local and municipal character to empower the city to participate in its creation to the extent contemplated.

In connection with this question it is suggested by plaintiff in error that section 3, Article XI of our Constitution prohibits the state from contracting a debt by loan to assist in defending the United States, except in time of war, and, there being no war, Denver is thereby precluded from cooperating in the project. Since we have determined that the proposed action of the city is for a strictly local and municipal purpose, it seems evident that the constitutional limitation suggested would have no application to this controversy. Under Article XX of our Constitution the City and County of Denver is

given exclusive power to act on local and municipal subjects and the bonds here involved are issued under that authority and under the limitations provided by section 8 of Article XI, relating to municipal indebtedness. Having determined that the purpose of the proposed action of the city is municipal, no consideration of the right of the state under similar circumstances is pertinent.

The plaintiff in error next asserts that the proposed issue would violate sections 1 and 2, Article XI, of the state Constitution. These sections, in so far as they are applicable to this proceeding, read as follows:

"Section 1. Neither the state, nor any county, city, town, township or school district shall lend or pledge the credit or faith thereof, directly or indirectly, in any manner to, or in aid of, any person, company or corporation, public or private, for any amount, or for any purpose whatever; * * *."

"Section 2. Neither the state, nor any county, city, town, township or school district shall make any donation or grant to, or in aid of, or become a subscriber to, or shareholder in any corporation or company, or a joint owner with any person, company or corporation, public or private, in or out of the state, * * *."

In the case of *Milheim v. Moffat Tunnel Improvement District,* 72 Colo. 268, 211 Pac. 649, Mr. Justice Allen, in his concurring opinion, page 297, briefly and concisely stated the purpose of these sections to be as follows: "Section 1 prohibits the state from lending or pledging its credit, directly or indirectly, to or in aid of any private person or corporation. Section 2 prohibits the state from becoming a joint owner with any private person or corporation." The defendants in error insist that section 1 in no manner pertains to the present controversy. However this may be, it seems clear that, unless the United States is adjudged to be a public corporation, the proposed donation to it by the city would not come within the inhibition of either of these sections of the Constitution. It undoubtedly is true that reference has been made

to the United States in many decisions as a corporation or public corporation, but we do not believe it can be considered as having that status in the sense in which that word is used in the sections of the Constitution we have quoted.

The rule we follow is well stated in *Vrooman v. St. Louis,* 337 Mo. 933, 88 S. W. (2d) 189 (1935), where the Missouri Supreme Court, under a similar situation, pointed out the inapplicability of cases of the character relied upon by the plaintiff in error here. In that case a gift of land by the city of St. Louis to the United States for the construction of a park to be maintained and operated by the federal government, was upheld. We quote from the opinion, page 945, as follows:

''But appellant says in effect that * * * the Enabling Act is invalid because it authorizes the making of gifts to, or the loaning of the credit of a municipality to, the United States, a corporation, in violation of sections 46 and 47 of article 4, and section 6 of article 9, of the Missouri Constitution.

''We do not agree to the premise that the United States is a corporation in the sense that term is used in the constitutional provisions referred to. The cases cited by appellant on the proposition that the United States is a corporation are not decisive of that question. To illustrate: The case of Respublica v. Sweers, 1 Dall. (Pa.) 41, 45, 1 L. Ed. 29, was a prosecution for forgery. The indictment alleged the United States had been defrauded. The form of the indictment was challenged on the ground that 'the United States was not a body corporate known in law.' The court held: 'From the moment of their association, the United States necessarily became a body corporate; for, there was no superior from whom that character could otherwise be derived.' Id., 1 Dall. (Pa.) 41, loc. cit. 48, 1 L. Ed. 29. The case of United States v. Perkins, 163 U. S. 625, 16 S. Ct. 1073, 41 L. Ed. 287, also cited by appellant involved the question of whether the United States was such a corporation as was exempt from taxa-

tion under a New York statute exempting corporations. The court held the statute applied only to corporations created under the laws of New York and subservient thereto.

"The authorities cited by appellant and others which we have examined indicate that the underlying reason for the infrequent characterization of the United States as a corporation resulted from an effort to demonstrate its power to discharge the functions of a sovereignty. The United States has been referred to as a corporation only in instances where the exercise of the sovereign power involved functions peculiar to corporations, as that term is used in its ordinary sense."

To the same effect are the cases of *Lancey v. King County,* 15 Wash. 9, 45 Pac. 645, and *Sacramento v. Adams,* 171 Cal. 458, 153 Pac. 908, deciding that a state is not a corporation within the meaning of constitutional provisions similar to those here under discussion. As was pointed out by us in the case of *Lord v. Denver,* 58 Colo. 1, 16, 143 Pac. 284, the intent of sections 1 and 2, Article XI, supra, is: "* * * to utterly prohibit the mingling of public moneys with those of private persons, either directly or indirectly, or in any manner whatsoever." No such purpose appears in the case before us. We, therefore, hold that the proposed expenditure by Denver does not contravene sections 1 and 2 of Article XI of the Colorado Constitution. We may add in this connection that the Attorney General, who appears here by virtue of section 88, chapter 93, '35 C. S. A., wherein it is provided that if a statute, ordinance or franchise is alleged to be unconstitutional he shall be served with a copy of the proceedings and be heard, is in accord with our views on the constitutional questions last discussed.

Our conclusion that the proposed expenditure is made a municipal and local purpose by reason of the direct public benefit arising therefrom, in effect disposes of plaintiff in error's contention that the bond issue violates the due process clauses of the federal and state

Constitutions (14th Amend. U. S. Const., and Art. II, §25, state Const.), since the decision of the United States Supreme Court relied upon, *Loan Association v. Topeka, supra,* is prefaced upon the premises that the only benefits which could arise from the outlay were *incidental* as distinguished from *direct.*

Likewise our holding on the principal point is necessarily decisive of the objection of plaintiff in error that the benefits claimed to result from locating the school in Denver cannot yet be determined, upon the theory that while the site for the school has been selected, the location of the bombing field has not, and this latter element leaves uncertain the definite ascertainment of the benefit to accrue to Denver. In deliberating on the propriety of the proposed cooperation of the city in the establishment of the school, we have considered the acquisition of the bombing field to be incidental to the project and that the direct local benefits mentioned would accrue to the city irrespective of the bombing field factor.

Objecting further, plaintiff in error asks the court to deny the right of the city to issue these bonds, for the reason that it does not appear there presently exists, either in the city or the United States, the power of eminent domain to acquire the land necessary to make the contemplated donation. There is nothing in the record to indicate that condemnation proceedings by either of the interested governments will be necessary to secure the required lands for the school and it may well be assumed that the tracts will be secured by voluntary grant of the present owners, as to conjecture upon situations involving the exercise of the right of eminent domain which may never arise. From a practical standpoint, we are confident that the United States and the city will be able to properly and successfully meet any contingency which may arise in this connection. Under the state of the record we are satisfied that this objection has no bearing upon the validity of the bond issue.

As another point plaintiff in error urges that

ambiguity and duplicity in the bond question submitted to the taxpayers voided the election. The ambiguity suggested is grounded upon plaintiff in error's critical grammatical analysis of the language, and the duplicity upon the unfortunate choice of a conjunction. We have carefully read the question as it appeared on the ballot and are satisfied it fairly stated the proposition submitted and that no voter could be deceived in any material particular by the form of the question.

Neither do we believe there is merit in plaintiff in error's contention that the election is void because of alleged false inducements held out to the electorate. This objection is based upon a statement in the preamble of the election ordinance of 1935, detailing the alleged benefits which would result from the establishment of an air corps technical school in the vicinity of Denver, to the effect that the federal government would invest approximately $6,000,000 on the project, whereas, in fact, it is pointed out, the enabling Act of Congress appropriates only $2,275,000.

Dillon in his work on Municipal Corporations (5th ed.), volume 1, page 430, section 213, has the following to say with reference to the effect of false representations on an election: "In determining whether the requirements of the Constitution or statute have been complied with, the courts cannot inquire into the motives prompting persons to vote on questions submitted where the voter freely and voluntarily exercised his right. Inducements in the way of statements and representations made to influence a voter, although false and fraudulent, will not invalidate the election if it does not appear that by force and fraud the voter was compelled to vote in a way he did not desire to vote." To the same effect are the cases of *Kansas Elec. P. Co. v. City of Eureka,* 142 Kan. 117, 45 P. (2d) 877; *Humphrey v. City of Pratt,* 93 Kan. 413, 144 Pac. 197; *Epping v. City of Columbus,* 117 Ga. 263, 43 S. E. 803.

Whether or not this be the general rule it is unneces-

sary for us now to determine, since we are convinced that this objection cannot be sustained in any event. Plaintiff in error by his pleadings has admitted the allegations of the defendants in error to the effect that provision has been made by the federal government for the ultimate expenditure of at least $6,000,000 on the project, by reason of which he is precluded from arguing that the questioned statement amounts to a false representation. Further, there is nothing in the ordinance which fixes a time within which the $6,000,000 should be expended or which makes such an investment by the United States a condition precedent to the issuance of the bonds and the donation of the site by the city.

The contention, that the city's offer of donation of the site was contrary to public interest and that the bonds are thereby invalidated, cannot be upheld. The record suggests nothing more than a legitimate and commendable effort on the part of the city to secure the establishment of the school for the welfare of the inhabitants or citizens of Denver. No authorities are cited holding that the bond issue would be invalidated even if the acts of the city did amount to a bargaining for a location.

It is finally asserted that the authority conferred by the taxpayers at the election on May 21, 1935, has lapsed by reason of the delay of more than two years intervening between the date of the election and the passage of the bond ordinance. The law applicable is uniformly to the effect that a delay, even of several years, in the exercise of the authority to issue bonds will not necessarily cause a forfeiture of that authority if, in the light of all the facts and circumstances, the delay was reasonable, prudent or necessary. *Nall v. City of Elizabethtown,* 200 Ky. 321, 254 S. W. 893; *City of Dayton v. Board of Education,* 201 Ky. 566, 257 S. W. 1021; *Jones v. Coleman,* 152 Ga. 795, 111 S. E. 377.

In view of the obstacles which had to be overcome in the way of securing favorable federal congressional and executive action upon the project, we believe the inter-

vening time here was more brief than usually would be the case and the authorization of the electors was in no way nullified by this reasonable and unavoidable delay. It may further be mentioned that it was obvious from the wording of the ballot question that the bonds would not be issued by the city unless and until the school was authorized by the United States, from which a voter could, and we believe, would, reasonably assume that a period of negotiation would intervene before the bond ordinance would be adopted.

The judgment is affirmed.

Mr. Chief Justice Burke and Mr. Justice Holland, believing this is not a local or municipal project, dissent.