15919

SMITH v. ROBERTSON *ET AL.*

(41 S. E. (2d) 631)

*Messrs. Stoney, Crosland & Pritchard,* of Charleston, for Petitioner, cite:

*Mr. John I. Cosgrove,* of Charleston, for Respondents, Edward H. Robertson et al., and *Mr. John M. Daniel,* Attorney General, of Columbia, and *Messrs. R. McC. Figg, Jr.,* and *Huger Sinkler,* of Charleston, for Respondent, The Medical College of the State of South Carolina, cite:

February 28, 1947.

L. D. LIDE, AAJ.: Pursuant to permission duly granted, this action was instituted in the original jurisdiction of this Court by the petitioner above named against the respondents above named to secure a permanent injunction against the issuance of certain bonds of Charleston County, the petition alleging that the act authorizing and directing the issuance of these bonds is unconstitutional, upon the various grounds therein set forth. The cause was heard by us upon the verified pleadings, including certain exhibits, and the arguments of counsel for the respective parties.

The factual allegations of the petition are admitted in the return, and the additional facts set forth in the return, as distinguished from mere opinions and legal conclusions, are not controverted by the petitioner. The petitioner is a resident, a citizen, freeholder and taxpayer of the County of Charleston and the State of South Carolina, and the respondents are the County Board of Commissioners of Charleston County and The Medical College of the State of South Carolina. The latter is a corporate entity created by the General Assembly for the maintenance of a State owned Medical College, the management and control thereof being vested in a board of trustees, all of which will more fully appear by reference to Sections 5794 to 5799, both inclusive, Code 1942. The same will hereinafter sometimes be referred to as the Medical College.

The General Assembly of the State of South Carolina at the regular 1946 session duly adopted an act, approved by the Governor on March 25, 1946, and effective on that date, the same being designated as No. 603, Acts 1946,

page 1734; and might properly be called the appropriation act. For this act refers to a number of State institutions, including the Medical College, making appropriations for each one of them, the appropriation for the Medical College being in the sum of $1,500,000.00; the funds appropriated for this particular institution being "for hospital and clinical facilities" for use by it on a matching basis with funds to be furnished by the Federal Government. And the act provides with regard to all of these institutions, in substance, that none of the funds appropriated shall be spent for the acquisition or purchase of any land site on which buildings are to be erected, but that the respective buildings shall be erected on land now owned by the respective institutions, and if suitable land sites are not now owned (quoting) "the respective counties wherein such institution or institutions are located shall furnish, at their own expense, such necessary land upon which said buildings are erected".

Shortly thereafter, and at the same session of the General Assembly, an act was duly adopted which was approved by the Governor on April 3, 1946, and effective on that date, designated as No. 889, Acts 1946, page 2612; and this act will hereinafter be frequently called the bond act. And this is the act the constitutionality of which is attacked in the action at bar, the full title thereof being as follows:

"An Act to Give and Grant to Counties and Certain State Institutions the Right to Acquire Lands, by Purchase or Condemnation, for the Construction of New Hospital Buildings of Such State Institutions and for the Erection of Hospitals and/or Medical Centers in Such Counties; to Authorize and/or direct the Counties Authorized or Required to Furnish Such Lands to Issue County Bonds in Amounts Sufficient to Pay the Acquisition Costs Thereof; and to Provide for the Levy of Taxes in Such Counties to Pay Principal and Interest of Any Bonds Issued Hereunder."

This act, among other things, authorizes and directs the County Board of Commissioners of every county which is

required to furnish land in connection with the construction of new buildings for any State institution, to issue negotiable coupon bonds of the county in an amount sufficient to pay the total cost to such county of the land, together with the costs and expenses of its acquisition; such bonds to be general obligations of the County, the proper officers being directed to levy and collect annually a tax upon all taxable property in the county sufficient for the payment of the same.

Pursuant to this act the Board of Trustees of the Medical College, acting through the Dean thereof, notified the County Board of Commissioners of Charleston County in writing of their plans to construct a teaching hospital, to be used in conjunction with the activities of the Medical College, and requested the County Board to make available to it, as a site for the same, a tract of land in the City of Charleston encompassed by Lucas Street on the west, Doughty Street on the north, Ashley Avenue on the east, and Mill Street on the south. In accordance with this request the County Board held a meeting on January 13, 1947, and duly adopted a resolution, a full copy of which is attached to the petition herein as an exhibit thereto. This resolution provides for the issuance by Charleston County of $350,000-.00 general obligation bonds as described in the bond act, the proceeds of which are to be used to acquire the site for the teaching hospital, and the bonds, both principal and interest, are to be payable from a direct *ad valorem* tax upon all taxable property in the County of Charleston. The resolution, however, specifically stipulates that the bonds in question shall neither be advertised for sale nor issued until the Chairman of the County Board shall receive from the Board of Trustees of the Medical College "a certificate, certifying that there is available to said Board the sum of not less than Four Million ($4,000,000.00) Dollars, and that said sum has been irrevocably allocated to the construction and equipment of a Teaching Hospital to be located on the site contemplated by this Resolution".

The resolution also recites that the estimated cost of acquiring the site is $350,000.00 and that the Board has determined that this site is a suitable one, and has found as a fact that the construction by the Medical College of this hospital in the County of Charleston (quoting) "would be of especial and peculiar benefit to the residents of Charleston County in the enjoyment of the improved hospital facilities thus provided, and that the location of such hospital in said County, will be of special benefit to the property owners therein to an extent greater than the amount to be expended by said County in providing the land to make the construction of the hospital possible".

The bond act, the constitutionality of which is questioned in this action, contains, as hereinbefore indicated, the following limitation with reference to the amount of the bonds, to wit, that they shall not exceed "an amount sufficient to pay the total cost to the county of said land together with the costs and expenses of the acquisition thereof, whether by purchase or condemnation".

The petition raises in proper form several objections to the constitutionality of the bond act, expressly alleging that it is in violation of certain provisions of the State and Federal Constitutions. These objections are five in number, but in view of petitioner's brief we think they may be treated as making four questions to be considered and answered by us.

However, before entering upon the discussion of these important constitutional questions we deem it proper to recall the well established rules prescribed for the guidance of the Court in matters of this character, as carefully and accurately stated in the following excerpt from the opinion of the Court in the case of *Clarke v. S. C. Public Service Authority,* 177 S. C. 427, 181 S. E. 481:

"The Court in this case is called upon to pass upon the constitutionality of the Act. In determining this question it is to be observed that it is a well-settled rule in South Car-

olina that: A statute will, if possible, be construed so as to render it valid; that a legislative Act will not be declared unconstitutional unless its repugnance to the Constitution is clear and beyond reasonable doubt; that every presumption will be made in favor of the constitutionality of a legislative enactment; that it will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonabe doubt that it violates some provision of the Constitution; that all reasonable presumptions must be made in favor of the validity of the Act; and that the Constitution of South Carolina is a limitation upon, rather than a grant of, legislative power."

The first and fundamental question before us may be briefly stated as follows:

*Does the bond act violate Section 5, Article X, or Section 6, Article X, of the State Constitution, relating to the levy of taxes and the issuance of bonds by counties?*

Section 5 provides that counties, as well as certain other public or municipal corporations, may be vested with power to assess and collect taxes for corporate purposes, and there are certain provisions in this section relating to the issuance of bonds. But Section 6 to a certain extent limits the levy of taxes and the issuance of bonds, for it provides that the General Assembly "shall not have power to authorize any county or township to levy a tax or issue bonds for any purpose except for educational purposes, to build and repair public roads, buildings and bridges, to maintain and support prisoners, pay jurors, county officers, and for litigation, quarantine and court expenses and for ordinary county purposes, to support paupers, and pay past indebtedness".

If the proposed hospital were a Charleston County owned institution, instead of being State owned, it does not appear that any objection could be raised to the constitutionality of the act, in view of our former decisions, especially *Battle v. Willcox*, 128 S. C. 500, 122 S. E. 516; and incidentally

*Law v. Spartanburg,* 148 S. C. 229, 146 S. E. 12. Certainly the fundamental basis of the petitioner's attack is his contention that because of State ownership and control the taxpayers and people of Charleston County have no such interest as will warrant the levy of taxes or the issuance of bonds in order to provide a site for the hospital. Yet it must be obvious that the benefits to be derived by the people of Charleston County from the establishment of a $4,000,000.00 hospital of about 325-bed capacity, as a teaching or clinical hospital in connection with the Medical College, are incalculable, when considered from the viewpoint of the public health and welfare.

It is indeed true that the citizens of other counties of the State would have an equal right to obtain the services of the hospital, but in the very nature of things a decidedly large percentage of the patients who would be treated there would be persons residing in Charleston County. It may also be observed that the location of such a hospital in the county will undoubtedly be of some special and peculiar benefit to its residents, because of the fact that they will have quicker and cheaper access to it than will the people of any other part of the State.

And it will of course be borne in mind that the total amount of the cost chargeable to Charleston County is less than ten per cent. of the amount to be invested in the construction of the hospital. Furthermore, the very words "clinic" and "clinical" themselves suggest that many of the persons who will receive treatment at the hospital will be those who will be unable to pay for the services rendered, or at least unable to pay adequately; while as shown by the return the services of the hospital "are to be compensated for in proportion to the patient's ability to pay".

We find nothing whatever in our Constitution which provides that the Legislature shall have no power to authorize a county to levy a tax or issue bonds for any purpose unless the county is the sole beneficiary thereof,

to the exclusion of the State or any body politic and corporate. We are, therefore, of opinion that the proposed bond issue here comes clearly within one of the categories referred to in Section 6, to wit, "public * * * buildings". Hence we need not consider whether or not it also comes within the category described as "educational purposes".

The important case of *Battle v. Willcox*, 128 S. C. 500, 122 S. E. 516, above mentioned, has of course established the principle that the erection and maintenance of a hospital may be lawfully undertaken by a township or a county, under a plenary grant of power from the General Assembly, and that hence the building essential to the discharge of that function would be deemed a public building "in the sense that it would promote a public service or subserve a public use", and the decree of the Circuit Judge to that effect was expressly held to be correct. The Supreme Court further held that the building might also be classified as a public building "from another viewpoint", because the township which was to issue the bonds in that case would have title to, and control of, the hospital building. But there is nothing whatever in the opinion which justifies the conclusion that a hospital building cannot be regarded as a public building unless it is owned and controlled by the township or county issuing the bonds. The proposed hospital involved in the instant case will surely promote a public service and subserve a public use; and we are of opinion that the benefits to be derived by the County of Charleston, as distinguished from the other counties of the State, are quite sufficient to authorize the legislation in question.

As pointed out in the brief of counsel for the respondent, it is clear that the General Assembly in the case before us has acted in a dual capacity, that is to say, for the State and for the County of Charleston. And in such dual capacity it has provided for the construction of the hospital as a joint program, since it has concluded that the hospital will subserve public purposes of each governmental entity; and to this end has determined the proper contribution which each

should make to the joint project, presumably having taken into account the purposes of each entity which will thus be fulfilled.

It cannot be doubted that the State has power to construct the hospital, and that the County of Charleston also has the power to construct it. How can it then be logically said that the State and the County do not have the power to construct it as a joint project? For we have nothing in our Constitution which prohibits cooperation between two governmental entities, created under it, in doing what each of them might do alone.

Indeed, such cooperation has been recognized by this Court in a number of cases, one of them being the case of *Allen v. Adams,* 66 S. C. 344, 44 S. E. 938, which seems to be very much in point here. For it was there held in a well-considered opinion delivered by Mr. Justice Jones that the Town of Edgefield had the right to issue bonds in the sum of $15,000.00, the proceeds of which were to be applied to the erection of a school building, which, although located in the Town of Edgefield, was to be managed and controlled by the trustees of the school district in which the town was situate; and the Court expressly alludes to the special benefits inuring to the inhabitants of the town. See also *Jordan v. City of Greenville,* 79 S. C. 436, 60 S. E. 973.

But the principle of cooperation between governmental entities in the joint accomplishment of a public purpose, which each could accomplish separately, has been upheld in a number of other cases decided by us, to some of which reference will now be made.

The case of *DeLoach v. Scheper,* 188 S. C. 21, 198 S. E. 409, is particularly illuminating; for in that case the Board of County Directors of Beaufort County was authorized by the General Assembly to issue $300,000 of bonds of any township or group of townships in the county, selected by the board, to raise funds to furnish the sponsor's share of

the construction of certain bridges located in St. Helena Township in that county. This legislation was attacked upon the ground that it was unconstitutional, in that, it required the levy of a discriminatory tax on certain property in Beaufort County, because two of the townships were wrongfully taxed for improvements outside of their boundaries, since the bridges when completed would lie wholly within St. Helena Township, while the taxes would be levied in that and two other townships. In answer to these contentions the Supreme Court said: "It seems to us, however, that what has been done here is to group several political subdivisions together to cooperate in a venture which will inure to the benefit of them all. There can be no objection to this".

It is also of interest to observe that the cited case involves "public * * * bridges", and these words occur in the same clause in Section 6 as that which relates to public buildings.

There are other important cases involving the principle of cooperation between governmental entities, particularly with reference to highways. One of these is the important case of *Evans v. Beattie*, 137 S. C. 496, 135 S. E. 538, in which the Court expressly held that "it is well settled that the Legislature can authorize two or more political subdivisions to make a joint contract".

The contemporaneous cases of *Briggs v. Greenville County*, 137 S. C. 288, 135 S. E. 153, is to the same effect. That was a clear case of cooperation between Greenville County and the State in the accomplishment of a purpose which was within the constitutional power of each, despite the fact that the county had to issue bonds and borrow the money which was turned over to the State Highway Commission to be expended by it in the construction of a portion of the State Highway System in that county.

We shall now consider some of the authorities from other jurisdictions, tangent to the matter under discussion, which of course are persuasive only. And first we direct attention

to the statement of the general rule as found in 38 Am. Jur. 96, as follows:

"In general, it is held to be within the power of the legislature to authorize municipal corporations to use their funds to secure the location or retention of a state institution within their boundaries. Such an expenditure is held to be for a corporate purpose and beneficial to the municipality, and is held not to be within constitutional inhibitions of gifts or loans of credit to any company, association, or corporation. Thus, a statute authorizing the expenditure of municipal funds for campus extension to induce the location thereon of the state university has been held to be constitutional as authorizing the expenditure of funds for a public purpose."

We also quote the following from 38 Am. Jur. 251-252:

"The power of a municipal corporation under legislative authority to expend funds raised by taxation upon public institutions, such as hospitals, schools, and similar undertakings, which are owned, operated, and controlled by the municipality, is unquestioned. The purpose is nonetheless public if the institution is constituted a corporation separate from the municipality, provided the corporation is a public and not a private one, and is under a legal obligation to serve the public, and its officers are chosen, directly or indirectly, by the public and not by private individuals or associations. Institutions of this character when maintained by the state for the benefit of all its citizens are ordinarily paid for by taxation upon the state as a whole, but there is nothing unconstitutional in a statute which permits a municipality, as an inducement to the state to locate such an institution within its corporate limits, to make a donation or subscription in money, bonds, or lands, to aid in the establishment and construction of the institution in the desired place."

One of the leading cases on this subject, which is frequently cited, is the United States Supreme Court case of *County*

of *Livingston v. Darlington,* 101 U. S. 407, 25 L. Ed. 1015, which arose in Illinois and relates to county bonds proposed to be issued to secure the location of the State Reform School within the limits of the county. The opinion of the Court was delivered by Mr. Justice Harlan, and it is therein held that if, as adjudged by the Supreme Court of Illinois, the (quoting) "taxation, in the constitutional sense, was for a corporate purpose whenever imposed for a public purpose; we do not perceive upon what just ground it can be held not to be a corporate purpose for a municipality to make, under express legislative authority, a donation to secure the location within its limits of a state reform school, wherein juvenile offenders and vagrants may receive such care, discipline, education and employment as, while effecting or contributing to their reformation, will protect the community in which they live from the evils and dangers which confessedly result from idleness and vagrancy among the young."

And the Court also said:

"That the school established was a state institution, to be maintained after being established at the expense of the State, but in the benefits of which the County where it was located could participate, does not, it seems to us, affect the question of legislative power. It is a matter rather of public policy or expediency, the determination of which, the power existing, belongs to the Legislative Department."

In the case of *Cox v. Commissioners of Pitt County,* decided by the Supreme Court of our sister State of North Carolina, and reported in 146 N. C. 584, 60 S. E. 516, and 16 L. R. A. (N. S.) 253, it was held that a county bond issue in aid of a state training school to be located in Pitt County was valid, notwithstanding the constitutional objections raised thereto. The Court in the opinion, which was delivered by Mr. Justice Brown, says:

"The purpose in issuing these bonds is to secure the establishment within the county of Pitt of the Eastern Caro-

lina Teachers' Training School, in accordance with the terms of the act establishing it. Chapter 820, p. 1165, Acts 1907. That such donation is not for a private purpose, but intended to assist a great public institution, which will be of inestimable local, as well as general, benefit, cannot be doubted. The principle indorsed by the Supreme Court of the United States is that, if the donation is for a public purpose, *viz.,* for the benefit of the inhabitants of the municipality, then it would be for a corporate purpose."

The Wisconsin case of *Lund v. Chippewa County,* 34 L. R. A. 131, related to the issuance and sale of certain county bonds to secure the location within that county of a state institution for the feeble-minded. The Supreme Court overruled the constitutional objections and held in favor of the validity of the bond issue. We quote the following from the opinion:

"In the case at bar it must be conceded that the establishment and building of the Wisconsin Home for Feeble-Minded was and is a public purpose. It must also be conceded that there are peculiar and special benefits which will naturally spring from such location. This is manifest from the fact that numerous such municipalities, by a tender of such donations, entered into competition for such location. The right of convenient visitation by friends of the unfortunate inmates is of itself a valuable right. Without further specification or discussion, we must hold the provisions of the act in question to be valid."

In the Tennessee case of *Ransom v. Rutherford County,* 123 Tenn. 1, 130 S. W. 1057, Ann. Cas. 1912-B, 1356, the constitutionality of two acts authorizing the issuance of bonds by Rutherford County and by the City of Murfreesboro, respectively, for the purchase of a site for a state normal school to be established within the borders of these political subdivisions, and for other aid thereto, was vigorously attacked, but the Tennessee Supreme Court sustained the

validity of these acts. We quote the following brief excerpt from the elaborate opinion which was rendered:

"While it is true the state normal school to be established under the provisions of this act is a state institution, it combines features providing for educational advantages which are peculiarly accessible to the scholastic population of Rutherford County and the City of Murfreesboro, thus combining with the state purpose also a municipal and county purpose.

"We can perceive no constitutional obstacle in the way of the state, county, and city combining for the establishment and maintenance of such an institution."

The Nebraska case of *Sinclair v. Lincoln,* 162 N. W. 488, L. R. A. 1917-E, 842, relates to the levy of a tax by the City of Lincoln for a campus extension to induce the location of the State University therein, and the Supreme Court held that such a levy would be proper, citing in the opinion and quoting from two of the most important cases relating to the general subject now under discussion, to wit, the Massachusetts case of *Merrick v. Amherst,* 12 Allen 500, and the Indiana case of *Marks v. Purdue University,* 37 Ind. 155.

A valuable annotation on the whole subject will be found in L. R. A. 1917-E 845, at the foot of the Nebraska case above cited. In this annotation it is said, although there are some cases *contra:* "Most of the cases support the power of the legislature to authorize counties or municipalities to use their funds to secure the location of a state institution". And reference may also be had to annotations in 46 A. L. R. 698, and 123 A. L. R. 997.

While the reasoning of the opinions in cases from other jurisdictions hereinbefore cited seems to us to be quite sound and logical it will be recognized that they do not deal with the precise situation before us, because they did not involve the construction of a *hospital.* And for this reason,

as well as others perhaps, the benefits accruing to the counties or municipalities in those cases might not be deemed commensurate with those which may be reasonably anticipated to inure to the benefit of Charleston County in the case at bar.

Our own rather novel case of *Haesloop v. City Council of Charleston,* 123 S. C. 272, 115 S. E. 596, related to the right of the City Council of Charleston to convey a certain parcel of land already owned by it, upon the condition that a tourist hotel of high cost and value should be erected thereon. The case came before this Court in its original jurisdiction, and the injunction sought by a citizen and taxpayer of Charleston was refused. Thereafter the land was conveyed and the Fort Sumter Hotel built thereon. The interesting opinion of this Court was delivered by Mr. Justice Marion, and in the course of his elaborate discussion of the matter, including its many incidents, he says:

"In ascertaining what is a public purpose within the power to tax, such benefits from a proposed expenditure as will accrue from increased taxable values, from enhancement of property values generally, and from increased impetus to the commercial life of the community will ordinarily be considered of too incidental or secondary a character to justify an outlay of public funds."

The words quoted are strongly relied upon by counsel for the petitioner in the case now before us, but it is quite obvious that this statement of the Court was in no wise necessary to the decision of the *Haesloop case,* and is really an *obiter dictum,* for the Court there rightly held that the power of the municipality to convey the land was not dependent upon any theory of such a beneficent public purpose as would justify the levy of a tax, in procuring the construction and establishment of an attractive tourist hotel in the city; although the city council were entitled to take into consideration such resulting advantages in conveying property already owned by the city.

This case is not in point for manifestly if the proposed hospital here were a private enterprise for profit, the County of Charleston would not be authorized under the Constitution to issue bonds in aid thereof, even if certain public benefits might be derived therefrom. But when, as here, the project is a public enterprise owned by the State, the local benefits accruing to the county are determinative of the question of whether its bonds may be issued to contribute to the establishment thereof. And it may be further observed that the benefits which may be reasonably anticipated to accrue to Charleston County in the case at bar include important benefits not covered by the language used by Mr. Justice Marion, for the reason that such benefits can scarcely be measured solely by financial standards.

It is stated in the return that the "General Assembly has concluded that there is a special and peculiar benefit to those living in the territory comprising Charleston County from the establishment of a Hospital in said County, as it will be more accessible to them". Counsel for the peeitioner point out that no such declaration can be found in the bond act itself, although there is a finding to that effect in the resolution of the County Board. But under the well established rule it will be presumed that a like conclusion was reached by the General Assembly; and that it was a reasonable conclusion cannot in our judgment be doubted.

In passing it may be mentioned that counsel for the petitioner emphasize in their brief that the act in question does not provide for any limit on the amount of bonds to be issued, meaning, we assume, a precise mathematical limit. But as we read the act the limitation therein contained is as specific as could well be expected, for it is expressly provided, as hereinbefore shown, that the bond issue shall not exceed the amount sufficient to pay the cost to the county of the land, "together with the costs and expenses of the acquisition thereof, whether by purchase or condemnation". And certainly there is no intimation that the limit has been exceeded.

We do not overlook the suggestion that the title to the hospital will be in the State and the control thereof in the Board of Trustees of the Medical College, a State institution; and that hence the County of Charleston has no assurance that the hospital will be maintained as contemplated, and continue so to be maintained, to the end that the county may receive the anticipated benefits. While it is true that there is no express contract between the State and the County of Charleston declared in the bond act under consideration, we hold that, to the extent needed to justify the joint project, the State holds title and exercises control on behalf of Charleston County, the latter being of course a component part of the State. In other words, there is a clearly implied obligation on the part of the State to operate the hospital as planned and to continue so to do, or else to make just compensation to the county. We cannot assume that such an obligation would be disregarded in any respect.

We are therefore of opinion that the bond act does not in anywise infringe upon any of the provisions contained in Sections 5 and 6, Article X, of the State Constitution.

The second question is as follows:

*Does the bond act violate the equal rights clauses of the State Constitution and the Fourteenth Amendment to the Federal Constitution?*

Since we have held for the reasons above set forth that the General Assembly was fully empowered under Sections 5 and 6, Article X, of our State Constitution to authorize and direct the issuance of the bonds in question by the County of Charleston, it necessarily follows that there has been no denial to the petitioner of the equal protection of the laws. Certainly the levy of a tax upon the taxpayers of Charleston County for the retirement of bonds issued under a legislative act for a legal county purpose, that is to say, a corporate purpose or a public purpose,

pursuant to the constitutional sections aforesaid, could not be adjudged to be a violation of the equal rights clauses of the Federal and State Constitutions.

The third question is as follows:

*Does the bond act violate Section 1, Article X, of the State Constitution providing for a uniform and equal rate of assessment and taxation?*

Manifestly, this provision does not mean that all ██ ██ counties shall have the same tax levy, but rather that uniformity of taxation must be coextensive with the territory to which the tax applies. And this was so held in the case of *Nettles v. Cantwell*, 112 S. C. 24, 99 S. E. 765; the Court stating "That there is a compliance with the requirements of the Constitution, in this respect, whenever the tax is uniform in the particular subdivision of the State upon which it is imposed". See also 61 C. J. 133-135, wherein the applicable principles are fully and clearly stated.

Furthermore, the Wisconsin case above cited, to wit, *Lund v. Chippewa County*, 34 L. R. A. 131, specifically holds that the constitutional rule of uniformity in taxation is not violated by a statute authorizing a county to make a donation to secure the location of a state institution within the county, although that county as well as the others will be taxed for its maintenance.

We do not think this constitutional objection can be sustained.

The fourth and final question before us is as follows:

*Does the bond act violate the due process clauses of the State Constitution and the Fourteenth Amendment to the Federal Constitution, in that, no hearing was provided for or granted on the propriety and advisability of issuing the bonds?*

What we have heretofore said with reference to the second question, relating to the constitutional equal rights clauses, is quite applicable here. Since, as we have held, the General Assembly was fully empowered under Sections 5 and 6, Article X, of our Constitution to authorize and direct the issuance of the bonds in question by the County of Charleston, the only logical conclusion that can be drawn is that this was a legislative act and not a judicial one, and hence no notice or hearing was required. The authorities cited by counsel for the petitioner do not appear to relate to *ad valorem* taxes, but to assessments imposed upon specific property for local improvements, and are therefore inapplicable.

The following statement of the law as contained in 16 C. J. S. 1404-1405, seems to us to be sound, and is well supported by the authorities therein cited:

"Notice and hearing are not required as regards the levy of general or *ad valorem* taxes, and a statute investing improvement districts with power to impose general *ad valorem* taxes within municipalities uniting in the formation of such districts does not deny due process of law because of failure to provide a hearing for landowners on the question of benefits, the taxes so authorized not being in the nature of assessments for benefits."

See also *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153, *supra,* and *Evans v. Beattie,* 137 S. C. 496, 135 S. E. 538, *supra.*

Our conclusion is that all of the questions presented by the petitioner should be answered in the negative, and that all of the objections raised to the constitutionality of the bond act should be, and they are hereby, overruled.

The judgment of this Court is that the injunction prayed for be refused, and that the petition be dismissed.

Fishburne, Stukes, Taylor and Oxner, JJ., concur.