The SCHOOL DISTRICT OF KANSAS CITY, Missouri, Respondent,

v.

KANSAS CITY, Missouri, the Board of Park Commissioners of the City of Kansas City, Missouri, and Milton Avis, Treasurer of the City of Kansas City, Missouri, Appellants.

No. 50472

Supreme Court of Missouri,

En Banc.

Sept. 14, 1964.

Rehearing Denied Oct. 12, 1964.

Edward T. Matheny, Jr., Larry L. Mc-Mullen, Caldwell, Blackwell, Sanders & Matheny, Kansas City, for respondent.

Herbert C. Hoffman, City Counselor, Benj. M. Powers, Assoc. City Counselor, Ned B. Bahr, Asst. City Counselor, Kansas City, for appellants.

STORCKMAN, Judge.

This is a declaratory judgment action to determine questions of validity arising under a contract and agreement of cooperation for the erection of a library building by the plaintiff School District of Kansas City on public ground owned by Kansas City, Missouri, and under the control of its Board of Park Commissioners. The contract was entered into pursuant to § 70.220, RSMo 1959, V.A.M.S., between the School District and the City of Kansas City, Missouri, acting by and through the Park Board. The trial court held the contract to be valid and enforceable and the defendants have appealed. In essence the issues on appeal are whether the contract is authorized by the cooperation statute and whether it violates certain provisions of the City Charter. The essential facts are all stipulated and include the contract, plats of the land in question, and records concerning its acquisition, use and purpose.

The proposed library site is a tract occupying a substantial portion of the city block bounded by 47th Street on the north, 48th Street on the south, Main Street on the east, and Baltimore Avenue on the west, as the streets are designated on a plat identified as Exhibit I. The site is in the southern portion of an irregularly shaped strip of land called a parkway which extends generally north and south from 49th Street on the south to a little beyond Broadway and High Street on the north. The principal north and south streets included in the parkway are designated on the plat as Baltimore Avenue, Hamilton Street and Broadway. The parkway tract including the proposed building site was acquired by Kansas City by a condemnation proceeding begun in 1908. It was originally designated the Mill Creek Parkway and was later renamed the J. C. Nichols Parkway.

The ordinance passed in March 1908 entitled, "AN ORDINANCE TO OPEN & ESTABLISH A PUBLIC PARKWAY IN THE WESTPORT PARK DISTRICT IN KANSAS CITY, MISSOURI", recited that the Board of Park Commissioners had selected and designated certain lands "to be acquired and used for the purpose of a public parkway". The ordinance defined the boundaries of the tract to be taken by condemnation and ordained that "a public parkway be" opened and established in the tract and that "all the private property within the boundary lines above described is hereby taken and condemned for public use as a part of said parkway". By the condemnation judgment entered on February 28, 1910, in the Circuit Court of Jackson County, it was "considered, adjudged and decreed by the Court that the title in fee to and every other interest in the aforesaid lands so condemned be and is divested out of the owners thereof and all other persons interested and vested forever in Kansas City, Missouri, to the use of the Westport Park district of Kansas City, Missouri, as and for a public parkway according to law". The record of the proceedings of the Board of Park Commissioners of Kansas City dated December 4, 1911, discloses that the Board adopted resolutions establishing "a roadway along and upon a portion of Mill Creek Parkway" which appears to be in the parkway west of the proposed library site.

The contract and agreement of cooperation dated August 31, 1961, and entered into pursuant to § 70.220, RSMo 1959, V.A.M.S., in general provides that the School District will erect, maintain and operate on the land in question, without cost or charge to the Park Department or to Kansas City, Missouri, a branch public library, that the building may also include an auditorium or public hall suitable for public gatherings, and that the plans and specifications for the building will be approved by the Park Department and the School District. It is further provided that tennis courts presently located on the proposed site shall be relocated and that the School District will contribute to the cost of such relocation an amount not to exceed $200,000, and that the branch library building and all other portions of the property shall be maintained as a public building and as a public facility by

the School District as a public educational and recreative institution to promote the general interest and welfare of the people.

The contract and agreement of cooperation was duly approved by the School District, the Board of Park Commissioners, and by an ordinance of the City Council. Nevertheless, the City Counselor of Kansas City, advised the City Treasurer in a written opinion that he should refuse the $200,000 tendered by the School District because the contract as well as the ordinance approving it exceeded the lawful authority of the Park Department and the Council of Kansas City. The School District then instituted this action to determine the validity of the contract. The City of Kansas City, the Board of Park Commissioners and Milton Avis, the City Treasurer, were joined as defendants. The defendants will sometimes be referred to collectively as the City or Kansas City.

■ Since the City Treasurer refused to accept the sum of $200,000 provided by the contract for the relocation of the tennis courts, the parties contend that an amount in excess of $15,000 is in dispute, but our jurisdiction need not rest on that ground. The appeal is properly in this court because a construction of § 16 of Art. 6, Constitution of Missouri 1945, V.A.M.S., which grants municipalities and political subdivisions the right to make cooperative agreements, is involved in connection with the questions presented. Art. 5, § 3, Constitution of Missouri 1945; St. Louis Housing Authority v. City of St. Louis, 361 Mo. 1170, 239 S.W.2d 289, 293[3].

■ The City contends that the contract is not authorized by § 70.220, RSMo 1959, V.A.M.S., "because it is not within the scope of the City's power." Section 70.220 is one of the statutes enacted to implement § 16 of Art. 6 of the Constitution which provides that: "Any municipality or political subdivision of this state may contract and cooperate with other municipalities or political subdivisions thereof, or with other states or their municipalities or political subdivisions, or with the United States, for the planning, development, construction, acquisition or operation of any public improvement or facility, or for a common service, in the manner provided by law." The purpose of the constitutional provision is to enable municipalities and political subdivisions to effect economies and facilitate the performance of their related public functions although actual consolidation of the governmental agencies is not feasible.

Section 70.220 provides that any municipality or political subdivision of this state "may contract and cooperate with any other municipality or political subdivision * * * for the planning, development, construction, acquisition or operation of any public improvement or facility, or for a common service; provided, that the subject and purposes of any such contract or cooperative action made and entered into by such municipality or political subdivision shall be within the scope of the powers of such municipality or political subdivision." Section 70.220 follows the language of the constitutional provision, § 16 of Art. 6, but further spells out the requirement implicit in the Constitution that the subject and purposes of the cooperative contract or action shall be within the scope of the powers of the municipality or subdivision. By the contract in issue, the City agrees to exercise its powers to the end that a branch of the public library will be operated and maintained on a site in the parkway. The narrow question is whether such use of the land is proper under applicable state laws and the City Charter.

■ The Charter of Kansas City was adopted pursuant to constitutional provisions which are now §§ 19 and 20 of Art. 6 of the 1945 Constitution. Section 19 requires that the Charter be "consistent with and subject to the constitution and laws of the state". In case of conflicting or inconsistent provisions, the Charter must give way to the Constitution and state laws

in regard to governmental functions or general policies of statewide concern. State ex rel. Rothrum v. Darby, 345 Mo. 1002, 137 S.W.2d 532, 537[6]; State ex rel. Spink v. Kemp, 365 Mo. 368, 283 S.W.2d 502, 514[4–6]; City of Joplin v. Industrial Commission of Missouri, Mo., 329 S.W.2d 687, 693[7].

In support of its claim that the contract is not authorized, the City cites Schmoll v. Housing Authority of St. Louis County, Mo., 321 S.W.2d 494. This was a declaratory judgment action to test the legality of a cooperation agreement between St. Louis County and the Housing Authority of St. Louis County. As stated by the court, the principal issue in that case was: "The difficult and essentially meritorious problem upon this appeal is the fact that the county entered into this cooperation agreement by order and resolution of the county council and not by ordinance." 321 S.W.2d 497. The agreement was held to be invalid because the charter of St. Louis County required it to be entered into by the enactment of an ordinance even though the statute permitted approval of the agreement by an order of the county court or by a resolution. Thus, it is apparent that the Schmoll case did not involve the authorization or grant of power but rather the means or mechanics by which the power could be exercised. In the present case, the contract was approved by Kansas City acting by and through its Board of Park Commissioners and by a duly enacted ordinance of its City Council, as well as by the School District. The procedure by which the contract was consummated is not claimed to be insufficient or defective.

■ Under the condemnation proceedings in 1908, the City sought and obtained a fee simple title to all lands included in the description of the parkway; thereby all private interests therein by way of reversion or otherwise were extinguished. Chaplin v. Kansas City, 259 Mo. 479, 168 S.W. 763, 766[3]; Daly v. Kansas City, Mo., 317 S.W.2d 360, 364[5]. The Chaplin

case involved the same parkway and the court held the rights of an owner adjoining an alley in the parkway had been taken in the condemnation action. The City cites Price v. Thompson, 48 Mo. 361, on the proposition that lands dedicated to park purposes cannot be diverted. In that case, the original owner of the land on which the town of Brookfield was located recorded a plat by which he dedicated four acres as a park. The title was vested in the town in trust for the free use of all of the inhabitants of the town as a common or public ground and for no other purpose whatever. The court enjoined the construction of a public street through the park on the ground it was a diversion of the property from the use and purpose specified in the act of dedication. Since Kansas City owns the land in question in fee simple, the Price case and others like it are not applicable to the instant case.

■ This court has generally held that where land has been dedicated by a private grant to public use as a park with specific and definite limitations, the conditions must be complied with; but where land is purchased or condemned by a municipality for public use as a park, the uses to which the land may be put are much broader. Kirkwood v. City of St. Louis, Mo., 351 S.W.2d 781, 784[2]; Aquamsi Land Co. v. City of Cape Girardeau, 346 Mo. 524, 142 S.W.2d 332, 335[2]; 39 Am.Jur., Parks, Squares, and Playgrounds, § 21, p. 816.

■ One of the City's objections to the contract is that the proposed site of the branch library is part of a public highway which cannot be obstructed or diverted to the purposes contemplated by the contract. This is on the theory that the parkway including the library site is a form of highway. The initial question presented by this contention is whether the proposed site is a street or highway. The City relies chiefly upon Chaplin v. Kansas City, 259 Mo. 479, 168 S.W. 763, Municipal Securities Corp. v. Kansas City, 265 Mo. 252, 177 S.W. 856,

and Village of Grosse Pointe Shores v. Ayres, 254 Mich. 58, 235 N.W. 829. The language relied upon in each case is in substance that a parkway is a street or highway of a certain kind and not a park. The plaintiff, on the other hand, cites cases which liken a parkway to a park. Each line of cases may be correct depending on the circumstances; the name or designation "parkway" alone is not determinative. The term may refer to a thoroughfare or roadway which is landscaped or located in a park from which trucks and other heavy vehicles are excluded, or it may be used to designate the landscaped strip of land paralleling or in the center of a thoroughfare. Webster's Third New International Dictionary. It is properly stated in McQuillin, Municipal Corporations, 3d Ed., Vol. 10, § 30.05, that: "A parkway, as ordinarily understood, is neither exclusively a street nor exclusively a park but partakes of the character of both."

The configuration of the tract of land condemned as a parkway is aptly described by the language used in State ex rel. Porter v. Hudson, 226 Mo. 239, 126 S.W. 733, 734, as follows: "The Paseo is a public parkway or park scheme in charge of defendants as a board of park commissioners. It extends a great ways, and at the point in hand runs nearly north and south. We infer that the name 'Paseo' covers not only a boulevard proper, but *at certain places includes ground on one or the other side devoted to public park purposes, thereby swelling out to the limit of a park, anon dwindling to a boulevard."* Italics supplied. The parkway in question is approximately 100 feet wide at its northern extremity, according to the scale on the plat, Exhibit I. Proceeding south, the parkway widens, sometimes irregularly, until it reaches the area with which we are chiefly concerned, which is between 47th and 48th Streets. At the northern boundary of the proposed site, the parkway expands sharply and is approximately 700 feet wide from east to west; at the southern limit of the site, the parkway is about 900 feet wide. South of the proposed site, the tract again narrows to about 250 feet. The library site is said to consist of 2.8 acres. It appears to be about one-fifth of the expanded area of the parkway between 47th Street on the north and approximately 48th Street on the south. Since 1928 the library site has been occupied by public tennis court facilities and a stone maintenance building. The tennis court facilities are apparently quite extensive since it is estimated that the cost of relocating them will be $200,000 which sum is to be paid by the School District. The cooperation contract provides that the maintenance building may be removed by the Park Department within three months and if it is not so removed the building may be removed or used by the School District.

There is no claim that the proposed library site is presently or ever has been actually used as a street or highway. Furthermore, there is no showing that any portion of the proposed site will be needed as a street or highway in the foreseeable future. The park-like area remaining east of the site and the narrower width of the parkway north and south of the site renders it extremely unlikely that any of the library site will ever be required as a street or highway.

■ Under the City Charter, the Park Board is empowered to select routes and streets for boulevards. Section 54. It is the duty of the City Council, upon recommendation of the Board, to pass ordinances for the regulation and orderly government of parks, parkways, boulevards and public grounds, and to regulate traffic on all boulevards, parkways and highways under the Board's control, and the Council, upon recommendation of the Board, may regulate the kind and character of all vehicles used on or passing over all boulevards, parkways and highways under its control. Section 55. The agencies of the City upon whom these and similar duties rest have each approved the cooperation agreement which embodies the concept that the site is not and will not be needed for street or highway purposes.

Bearing on this issue also is the fact that the City has a fee simple title to the land constituting the parkway including the streets unencumbered by any reversionary interest or condition. In these circumstances, we hold that the proposed site for the branch library is not an integral part of a street or highway and the City's objection to the contract on that score is without merit.

■ Another point made by the City is that the contract in question is a conveyance in perpetuity which constitutes a diversion and alienation of parkway property in direct violation of § 58 of the Charter which provides that: "The lands which have heretofore and which hereafter may be selected and obtained under the provisions of this charter for park, parkway or boulevard purposes shall remain forever parks, parkways and boulevards for the use of all the inhabitants of the city." Section 66 of the City Charter prohibits the erection and maintenance of any structure within any park, parkway or public ground under the control of the Board except such as may be erected by the Board for park uses and "except such public memorials, museums, art galleries and other public buildings as are authorized by this charter." Section 1(39) empowers the City to acquire, operate and maintain educational, recreative and other institutions, facilities, conveniences, and services of any and every kind and character for any public or municipal use or purpose. A branch public library is an educational and recreative institution and facility within the purview of § 1(39) of the Charter. State ex rel. Carpenter v. City of St. Louis, 318 Mo. 870, 2 S.W.2d 713, 722[13, 14].

■ A modern-day public library is in the category of public buildings which may be erected and maintained in a park, parkway or on public grounds under the control of the Park Board pursuant to § 66 of the City Charter. 39 Am.Jur., Parks, Squares, and Playgrounds, § 29, p. 826; 38 Am.Jur., Municipal Corporations, § 562, p. 251, n. 7; Aquamsi Land Co. v. City of Cape Girardeau, 346 Mo. 524, 142 S.W.2d 332, 335[4]; Kirkwood v. City of St. Louis, Mo., 351 S.W.2d 781, 784–785[6]; State ex rel. City of Excelsior Springs v. Smith, 336 Mo. 1104, 82 S.W.2d 37, 41–42[8]; Spires v. City of Los Angeles, 150 Cal. 64, 87 P. 1026.

■ In Kirkwood v. City of St. Louis, supra, this court approved the use of approximately six acres of Forest Park in St. Louis for the construction of a four-lane highway. The park land had been obtained by condemnation and the provisions of the charter authorizing the City of St. Louis to acquire and dispose of real property and to alter parks were held to be sufficient to justify diverting a part of the park for use as a public highway. 351 S.W.2d 784–785. Sections 1(8) and 1(16) of the Kansas City Charter have the same legal effect. In the Aquamsi Land Company case, supra, the park land was also acquired by condemnation and this court approved the use of a large portion of it for a rather elaborate recreational and community center and fair grounds. The stipulation of facts discloses that Kansas City has three community centers operated by its Department of Welfare on park property. Among other improvements located on the City's parkways are a stable and storage barn, a casting pool and utility building, a fire alarm signal station and large stone and masonry fountains. The contract in question is not a conveyance or an alienation of the land constituting the proposed library site since the City continues to own it as a part of the City's park system. The construction and operation of a public library thereon is not an improper park usage. The assignment of error is denied.

The City further asserts that regardless of whether the area in question is park or parkway property its control is vested in the Board of Park Commissioners by § 55 of the Charter and the Board's authority cannot be delegated to any other governmental agency. Section 55, insofar as pertinent, provides that: "The board of park commissioners shall superintend, control and

manage any and all parks, parkways, boulevards and highways and public grounds belonging to or under the control of the city which at the time this charter becomes effective are under the control and management of the board of park commissioners, and such others as the council may, upon recommendation of the said board, place under its control and management; and may construct, improve, adorn, regulate and maintain the same in such manner as it may deem best; * * *." The contract provides that the erection, maintenance and operation of the branch library and the care and maintenance of the property described in the contract shall be the duty and obligation of the School District without cost to the City or the Park Board. It further provides that all portions of the property shall be maintained by the School District as a public educational and recreative institution to promote the general interest and welfare of the people, and that it shall be under the sole control and management of the School District. The City depends chiefly on the principle that a municipality cannot contract away any of its legislative powers so as to preclude it from meeting future emergencies in a proper way, and in support thereof it cites such cases as Thompson v. City of St. Louis, Mo., 253 S.W. 969, 972[2]; Stewart v. City of Springfield, 350 Mo. 234, 165 S.W.2d 626, 629[5]; and City of St. Louis v. Cavanaugh, 357 Mo. 204, 207 S.W. 2d 449, 455[6]. The rule exemplified by these cases is not controlling here. We need not discuss the amount of control or dominion surrendered or retained by the City and the Park Board because we deem that which was done to have express authority derived from the state Constitution and carried into the state statutes and City Charter.

Article 6, § 16, of the Constitution, in essence provides that municipalities or political subdivisions may contract and cooperate for the construction and operation of any public improvement or facility. This constitutional provision and the statutes implementing it expressly authorize a cooperative effort which in its very nature denotes a division or sharing of that which is necessary to achieve the common end. In discussing a statute similar to our constitutional provision, the Supreme Court of California in City of Oakland v. Williams, 15 Cal.2d 542, 549, 103 P.2d 168, 171–172, stated: "The statute means nothing if it does not mean that cities may contract in effect to delegate to one of their number the exercise of a power or the performance of an act in behalf of all of them, and which each independently could have exercised or performed." See also City and County of San Francisco v. Boyle, 191 Cal. 172, 215 P. 549, 556 [10, 11], and Smith v. Robertson, 210 S.C. 99, 41 S.E.2d 631, 639[8]. In Vrooman v. City of St. Louis, 337 Mo. 933, 88 S.W.2d 189, 193–194[2], it was held that the contribution of the City of St. Louis to the United States for the acquisition and construction of a national public park within the city was for a public and corporate purpose within the constitutional limitation, notwithstanding the fact that Congress would have control of the property and that non-residents might receive occasional benefits from use of the park. In State ex rel. Kansas City Ins. Agents' Assn. v. Kansas City, 319 Mo. 386, 4 S.W.2d 427, 430[1, 2], it was held that the authority of Kansas City to maintain a fire patrol included authority to contract for its maintenance.

■■■■ Section 16 of Art. 6 of the Constitution is a specific grant or recognition of authority which in case of conflict would be controlling over the provisions of the Kansas City Charter. But it appears that the Charter provisions can be so construed as to avoid a lack of harmony. In apparent conformity with the constitutional provision and § 70.220, the Charter of Kansas City in § 1(65) empowers the City to cooperate or join by contract or otherwise with other cities, states, or the United States or other governmental bodies for the construction or operation of any property or structures convenient or necessary for carrying out the purposes or objects authorized by the Char-

ter. This is in pari materia with § 55 relating to the control and management of parks and parkways. Thus, it appears that cooperative agreements are authorized by the City Charter as well as the Constitution and statutes. The contract is not invalid by reason of its vesting the School District with control of the library and the premises.

■ The City further contends that the contract violates § 67 of the Charter which restricts leases of concession agreements to a period of three years. The section provides that no part of any park under the supervision or control of the Park Board shall be leased to any "person, firm or corporation for any purpose" and that any lease of a building or parts thereof in any park for park purposes and any concession in any park for the sale of refreshments to the public using such park or for other park purposes shall not be for a longer term than three years. No shows or exhibitions of any kind shall be allowed in any park, parkway or public ground for profit, but educational entertainments and other exhibits approved by the Board may be provided or given for the use, enjoyment and welfare of the public. The obvious purpose of § 67 is to prevent exploitation of the parks and parkways by commercial and profit organizations or persons. The School District is a political subdivision devoted to public education and is not a "person, firm or corporation" as that term is used in § 67. State ex rel. Zoological Board of Control v. City of St. Louis, 318 Mo. 910, 1 S.W.2d 1021, 1027[6]; Vrooman v. City of St. Louis, 337 Mo. 933, 88 S.W.2d 189, 194[3]; McQuillin, Municipal Corporations, Vol. 15, § 39.26, pp. 79–80.

■ The contract is obviously not a concession agreement and does not have the elements of a lease. It is as we have held a cooperative agreement within the scope of the powers of the parties for the proper use of park property. It does not violate the provisions of § 67.

■ The City's final contention is that the contract confers powers which discriminate in the use of the library against a part of the inhabitants of the City in that the boundaries of the School District do not include all the territory within the City limits and a charge will be made for a library card upon inhabitants of the City who do not reside, own real estate, or have employment within the School District. The card entitles the holder to take from the library books which are subject to withdrawal. Bestowing the benefits and burdens of park facilities upon citizens equally is hardly possible. Whether it be playing tennis, browsing in a library or just sitting on a park bench, the enjoyment of the park facilities varies with the individual or may be entirely lacking. It is not unusual for a fee to be charged for the use of some special park facility or service. The fee for a borrower's card is designed to achieve some equality with respect to the support of the library system. In Vrooman v. City of St. Louis, 337 Mo. 933, 88 S.W.2d 189, 193[2], the court held that the contribution of funds by the city to the National Park within the city's limits was not invalidated by reason of the fact that non-residents of the city might use the park occasionally and receive benefits from it. In State ex rel. Zoological Board of Control v. City of St. Louis, 318 Mo. 910, 1 S.W.2d 1021, 1025–1026[3, 4], the establishment of a zoological park was held to be in the public interest and welfare and not stricty for a local purpose. The situation is similar with respect to public libraries including the proposed library in Kansas City. We hold that the charge complained of is not an invidious distinction or discrimination that would render the contract invalid. In the Matter of Proceedings to Grade North Elmwood Avenue in Kansas City, North, Clay County, Missouri, Mo., 270 S.W.2d 863, 868[3]; In re Kansas City Ordinance No. 39946, 298 Mo. 569, 252 S.W. 404, 408[3].

■ We find that it is within the scope of the City's power to allow the land in question to be used as a site for a public

library; the cooperation agreement and contract is not invalid in any of the respects alleged. Section 55 of the City Charter authorizes the Park Board to construct, improve, adorn and maintain the parks and parkways "in such manner as it may deem best". Its action in this instance has been approved by an ordinance duly enacted by the City Council. The courts are concerned only with the power of the City acting through its Park Board and City Council to enter into the compact and not with the wisdom or expediency of the transaction since it is for the legislative body and not the judiciary to determine the policy of the law. Kroger Grocery & Baking Co. v. City of St. Louis, 341 Mo. 62, 106 S.W.2d 435, 438[4], 111 A.L.R. 589; Downing v. City of Joplin, Mo., 312 S.W.2d 81, 84[5]; In re Kansas City Ordinance No. 39946, 298 Mo. 569, 252 S.W. 404, 407[1].

The judgment is affirmed.

LEEDY, HYDE, HOLMAN and HENLEY, JJ., concur.

EAGER, C. J., dissents in separate opinion filed.

DALTON, J., dissents and concurs in separate dissenting opinion of EAGER, C. J.

EAGER, Chief Justice (dissenting).

I hesitate to dissent in a case of this character, but I am impelled to do so. Basically, it is my opinion that neither the Constitution, the statutes, nor the Kansas City Charter authorize the City to cooperate with the School District in the use of *parkway* land for the erection and maintenance of a public library, which is strictly a school district function in that municipality. The School District has, for many, many years, built and operated all libraries in the City at its own expense by regular levies of school district taxes; the City has never attempted to acquire, erect or operate any library anywhere. The School District has recently built and is operating a new main downtown library at an enormous cost. The

functions of the City and the School District in this regard have been and are entirely separated. It simply is not the function of Kansas City to operate a library; possibly, it could do so under its general authority to "provide, operate and maintain * * * educational * * * institutions" [§ 1 (39) Kansas City Charter] *if* it acquired property for that purpose or even if it used property otherwise acquired for its general purposes, but I do not believe that this section of the Charter, as limited by the specific provisions governing park and parkway properties, or § 66 (referred to in the principal opinion) authorize a diversion of parkway property to a joint library enterprise; nor do I believe that the Charter would authorize the diversion of parkway property even to a library project operated by the City solely its own. Section 66 of the Charter is as follows: "*Sec. 66. Structures within parks.* Neither the council nor the board of park commissioners shall have authority, except as in this charter otherwise provided, to permit any person, association, firm or corporation to build or maintain any structure within any park, parkway or public ground under the control of the said board. No structure shall be erected or maintained in any such place except such as may be erected by the board for park uses, and such statues, monuments and works of art as may be approved by the art commission and erected by or under authority of the board, and except such public memorials, museums, art galleries and other public buildings as are authorized by this charter." Considering that section as a whole, I do not construe it to authorize the erection or maintenance of any buildings on park or parkway property except for uses directly or indirectly associated with parks or parkways. The "public buildings" reference, under the rule of ejusdem generis, is limited by the presence of the preceding words, namely, "public memorials, museums, art galleries * * *." Hence, the "public building" should be of that same character and type. In ordinary common sense, a library is not a

*park* project, nor even a recreational proj- ect. It is an *educational* project, and in Kansas City the School District is charged *solely* with providing and operating li- braries.

This discussion, so far, has principally involved *park* property. This tract is a *parkway*. I shall not indulge in any fine distinctions but a parkway, as all seem to concede, partakes at least of the character of a street or roadway, even though it be beautified here and there; and there are other distinctions in the Charter itself, as, for instance, the differing modes of acquisi- tion and payment. This land was thus ac- quired for the purpose, in whole or in part, of the movement of traffic, and this partic- ular tract is located in a position where such considerations have become most vital. Having been thus acquired, the City's pow- er to divert it is, in my opinion, much more restricted than if it had been acquired as a *park*. The City proposes now to put the tract to a use which would completely re- move it from its original purpose and func- tion and, for all practical purposes, to do so permanently, since there is no repossession provision. There is no time limit in this contract, and the erection of a very costly and permanent library on the site would naturally remove the tract forever from any possible use for street or traffic purposes. And, while this suggestion is not determina- tive in view of the Council's discretion in such matters, the location is such that no one may, with any assurance, foretell how soon the area may be vitally needed for traffic or freeway connections, ramps, or other traffic devices; it lies at the very gate- way to the highly commercialized Plaza District from the east and south.

Section 58 of the Charter provides that lands acquired for "park, parkway or boule- vard purposes shall remain forever parks, parkways and boulevards for the use of all of the inhabitants of the city." I do not rely, in any large part, on the somewhat sentimental argument of the City about "whittling away" the interests of posterity in Kansas City's extensive park and park-

way property, although this anticipated move may well alert the people to that dan- ger. I simply would deny the City the right to contract for this use because of a total lack of authority to do so; and, to my mind, this contract for the right to *use* the prop- erty, in essence forever, is simply an at- tempted evasion of the City's lack of power to deed the property outright to the School District.

The principal opinion is founded largely on § 16 of Art. 6 of the Constitution, which it construes most broadly. I note that the statute implementing that provision (§ 70.- 220) expressly limits all such cooperative agreements to those subjects and purposes which are "within the scope of the powers of such municipality or political subdivi- sion," which I construe to mean the powers of *each subdivision* so entering into such a contract. I do not construe the constitu- tional provision itself to mean anything *more*. It certainly was not the intent of the framers of the Constitution to give to any municipality any power or authority by way of "cooperation" which it did not have ini- tially. I, therefore, see no possible con- flict between the Constitution and those charter provisions which restrict the usages of property to the function or sphere for which it was acquired. The principal opin- ion thus suggests a possible conflict where none exists. The Constitution does not re- quire, nor do I think it authorizes, a diver- sion of property by a scheme of cooperation to uses for which it was never acquired or intended. The case of City of Oakland v. Williams, 15 Cal.2d 542, 549, 103 P.2d 168, cited in the principal opinion and decided under a statutory provision similar to § 16 of Art. 6, upheld a delegation of power, *provided, however,* that "each (city) in- dependently could have exercised or per- formed" that function. It is my view here that the city of Kansas City could not legal- ly have used parkway property for library purposes, directly or indirectly.

If the City has heretofore improperly permitted the erection of one or more small

and inconsiderable structures (such as the fire alarm station) on parkway property,— there are two answers: (1) one or more past wrongs do not make a "right"; and (2), solely as a practical matter, none of the buildings suggested are of such substance as to interfere permanently with future traffic problems, nor are any of them in such a vital location as the present site is. Some are in actual use by the Park Department itself, for parkway and park purposes. The community centers mentioned are on *park* property, and these are, in my opinion, in a wholly different category from that of a library; moreover, they are operated by the City itself. Here, the City does not pretend that it would participate in any way in the operation of the proposed library.

I am compelled to the view that the discretion vested in the legislative bodies of the City (the Park Board and the Council) cannot be stretched so far as to furnish an immunity to the actual illegality of this action; I am convinced that the contract is a violation of the wording and intent of the City Charter, that the Charter is not in conflict with the Constitution or the statute, and that the contract illegally proposes to divert (in essence *forever*) land acquired for parkway purposes to a use which would make it permanently unavailable for an essential part of the purpose for which it was originally acquired.

In the case of Kirkwood v. City of St. Louis, Mo., 351 S.W.2d 781, where park land was condemned for a trafficway (partially the reverse of our situation), the use to which the land was diverted was one admittedly within the scope of the City's powers and functions, and there was no reliance upon any authority created through a "cooperation." There the land was condemned; here we have a voluntary contract. There the traffic needs were stressed; here they are ignored.

In prior diversions of park or parkway land, the city of Kansas City has submitted the question to a vote of the electorate by proposed charter amendments. We see no

legitimate reason why this proposal has not been, and should not be, handled in the same manner. It is highly significant that the School District owns in fee the site of the abandoned E. C. White School, of considerably greater area, just to the southeast across the intersection of Brookside Boulevard and Main Street; that tract comprises 4.11 acres as compared to 2.8 acres in the controverted tract. (We have referred, as invited by stipulation of the parties, to our files in the prior mandamus proceeding filed by the School District against the City, No. 49 541, as well as to exhibits in the present case.) The present record contains no intimation as to what the School District proposes to do with that tract, nor is there anything to explain why it is not suitable for library purposes. While such decisions as the present one are generally within the discretion of the respective legislative bodies, provided the result is legally permissible, it is usually preferable that the record should contain some factual basis for the exercise of the discretion, if for no other reason than to justify a finding that the discretion has not been abused. The selection insisted upon here was apparently made upon the individual recommendation of Dr. Joseph L. Wheeler, an outside library expert, which, in turn, was based upon his personal survey of the area in *1947*.

I am mindful of the fact that liberal constructions of constitutions, statutes and charters are often required in the interest of progress, and in order to avoid frustrations of the real intent of the authors. But I am doubly conscious of the fact that we may not disregard or evade the real principles announced in those documents, even though a particular result may seem, at the moment, to be highly desirable. In order to maintain a measure of stability in our governmental functions and structures, we should exercise care to the end that we are not led in the name of progress into decisions which may, in the future, eradicate those guidelines and restrictions which have been created by an earlier, and perhaps a wiser, generation.